## DIERKES v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. June 7, 1921.)
No. 3362.

1. **Indictment and information ⬠60—Indictment charging clearly every element of offense generally sufficient.**

In general, an indictment which distinctly and clearly charges each and every element of the offense intended to be charged, and distinctly advises the defendant of what he is to meet at the trial, is sufficient.

2. **Indictment and information ⬠110(3)—Sufficient to describe offense in words of statute.**

Generally, in an indictment for a statutory offense, the offense may be described in the words of the statute, and it is for the defendant to show that greater particularity is required by reason of the omission from the statute of some element of the offense.

3. **War ⬠4—Indictment for seditious utterance sufficient.**

In an indictment under Espionage Act June 15, 1917, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), for using disloyal, scurrilous, and abusive language about the military forces of the United States, and language intended to bring the military and naval forces into contempt, scorn, contumely, and disrepute, it is not necessary to set forth the circumstances and setting in which the words were uttered.

4. **Constitutional law ⬠90—Disloyal utterances during war not within protection of Constitution.**

Language charged to have been used by defendant in referring to the President and the army when the United States was at war, in violation of Espionage Act June 15, 1917, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), *held* not within the protection of Const. U. S. Amend. 1.

5. **War ⬠4—Indictment under Espionage Act need not allege criminal intent.**

An indictment for violation of Espionage Act June 15, 1917, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), for uttering disloyal, scurrilous, and abusive language about the military forces when the United States was at war, need not charge a specific criminal intent not made by the statute an element of the offense.

6. **War ⬠4—Indictment under Espionage Act sufficient.**

In an indictment under Espionage Act June 15, 1917, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), for using scurrilous and abusive language about the army when the United States was at war, it is not necessary to name the person or persons to whom the words were spoken ; but under the settled practice such information can be obtained by defendant, if desired, by demanding a bill of particulars.

7. **Criminal law ⬠371(1)—War ⬠4—Evidence of prior statements admissible in prosecution under Espionage Act.**

In a prosecution under Espionage Act June 15, 1917, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), for uttering disloyal, scurrilous, and abusive language about the army when the United States was at war, evidence of previous statements made by defendant, either before or after the amendment of the statute, showing that he was disloyal to this country and favored Germany in the war, *held* admissible as showing his mental attitude and the intention with which the words charged were used.

⬠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **Criminal law ⟨key⟩1172(3)—Mistake as to evidence in instructions held not reversible error.**

That the court in its instructions assumed that there was evidence that defendant made a certain statement charged in the indictment, whereas the testimony of the witness who testified to such statement had been stricken out, *held* not ground for reversal, where defendant virtually admitted the statement when on the stand, and where the court's attention was not called, by exception or otherwise, to the mistake, which was shared by defendant's counsel, at whose request an instruction dealing with the statement was given.

9. **Criminal law ⟨key⟩698(2)—Failure of court to prevent cross-examination of defendant, not objected to, not error.**

That the court did not intervene on its own motion to prevent the asking of questions on cross-examination of defendant, which were answered without objection from defendant or his counsel, *held* not error.

10. **War ⟨key⟩4—Conviction for violation of Espionage Act sustained by evidence.**

The indictment and evidence *held* to warrant the conviction of defendant for using disloyal, scurrilous, and abusive language about the army when the United States was at war, in violation of Espionage Act June 15, 1917, tit. 1, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c).

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister and Andrew M. J. Cochran, Judges.

Criminal prosecution by the United States against J. Herman Dierkes. Judgment of conviction, and defendant brings error. Affirmed.

Froome Morris, of Cincinnati, Ohio, and Fred W. Schmitz, of Covington, Ky. (Sherman T. McPherson and Edward H. Brink, both of Cincinnati, Ohio, on the brief), for plaintiff in error.

James R. Clark, U. S. Atty., and Thomas H. Morrow, Asst. U. S. Atty., both of Cincinnati, Ohio.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiff in error was convicted upon the second and third counts of an indictment under section 3 of the Espionage Act of June 15, 1917 (40 Stat. c. 30, p. 217), as amended by the Act of May 16, 1918 (40 Stat. c. 75, p. 553 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c]). Each of these counts charged defendant with uttering, while the United States was at war with Germany and Austria, certain language, which in the second count is characterized as "disloyal * * * scurrilous, and abusive," and "about the military forces of the United States," and in the third count as "intended to bring the military and naval forces of the United States into contempt, scorn, contumely, and disrepute." The alleged errors presented relate to the sufficiency of the indictment, the sufficiency of the proof, the admission of testimony, and the charge of the court.

1. The alleged insufficiency of the indictment was presented by demurrer, which was overruled, and, after verdict, by motions for new

trial and in arrest of judgment both of which were denied. The language, which is the subject of the indictment, was alleged therein to have been spoken "in the hearing and presence of divers persons," and was this:

"The poor slob—I feel sorry for him. I would rather serve a term in the penitentiary than wear a uniform in Wilson's Wall Street war. Mohr would look like hell toting a gun in Wilson's Wall Street war."

The sufficiency of the indictment is challenged (a) as failing to state the person or persons to whom the words set out in the indictment were spoken; (b) in that the words so set out are not violative of the statute, because incapable of being construed as either disloyal or profane, scurrilous, or abusive, when spoken about the military forces of the United States, or so construable as to bring the military and naval forces of the United States into contempt, scorn, contumely, and disrepute; (c) that the words in question are protected by the First Amendment to the Constitution of the United States; and (d) that each count fails to charge a criminal intent.

[1, 2] The general rules as to the sufficiency of indictments are that the charge must be definite enough to enable the accused to make his defense and avail himself of the record of conviction or acquittal for his protection against further prosecutions, and to inform the court of the facts charged, so that it may decide as to their sufficiency in law to support a conviction, if one be had. The elements of the offense must be set forth with reasonable particularity of time, place, and circumstances. And while it is not always enough to charge a statutory offense in the language of the statute, yet, in general:

"An indictment which distinctly and clearly charges each and every element of the offense intended to be charged, and distinctly advises the defendant of what he is to meet at the trial is sufficient." Armour v. United States, 209 U. S. 56, 83, 84, 28 Sup. Ct. 428, 52 L. Ed. 681.

And generally:

"Upon an indictment for a statutory offense the offense may be described in the words of the statute, and it is for the defendant to show that greater particularity is required by reason of the omission from the statute of some element of the offense." Ledbetter v. United States, 170 U. S. 606, 612, 18 Sup. Ct. 774, 12 L. Ed. 1162; Armour v. United States, supra, 209 U. S. at page 84, 28 Sup. Ct. 428, 52 L. Ed. 681.

[3] The statute here in question completely defines the offense, and the indictment before us follows the language of the statute, and omits no element of the offense there defined and denounced. It was not necessary that the indictment set forth the circumstances and setting within which the words were uttered. Whether the language charged to have been used by defendant had a natural tendency to show the commission of the unlawful act charged was ultimately a question for the jury. Pierce v. United States, 252 U. S. 239, 244, 249, 250, 40 Sup. Ct. 205, 64 L. Ed. 542. At the very least, it cannot be said, as matter of law, that the language set out is, in appropriate environment, incapable of being reasonably construed as disloyal as to the military forces of the United States, and such as to bring those forces into contumely and disrepute, having in mind that the United States was

then at war, and that President Wilson was, by virtue of such office, commander-in-chief of the army and navy of the United States.

[4] The proposition that the language used is protected by the First Amendment to the Constitution is, in our opinion, answered by what is said in Schenck v. United States, 249 U. S. 47, 52, 39 Sup. Ct. 247, 63 L. Ed. 470; Frohwerk v. United States, 249 U. S. 204, 206, 39 Sup. Ct. 249, 63 L. Ed. 561; Abrams v. United States, 250 U. S. at pages 618, 619, 40 Sup. Ct. 17, 63 L. Ed. 1173; Wimmer v. United States, (C. C. A. 6) 264 Fed. 11, 12, 14.

[5] Of the objection that neither count charges a criminal intent it would seem enough to say that the clauses of the statute charged to have been violated (which were added by the amendment of 1918, for the purpose of broadening the scope of the statute) do not in express terms require a criminal intent, except as the word "intended" is used in the clause involved in the third count, and which is so charged therein. It is sufficient that the language be disloyal, profane, scurrilous, or abusive, that it be willfully used, and that it relate to the form of government, the Constitution, the military or naval forces, the flag or the uniform of the army and navy of the United States, or that the language is intended to bring any one of them into contumely or disrepute.[1] The words "willfully and feloniously" prima facie import an unlawful intent. Pierce v. United States, supra, 252 U. S. at page 244, 40 Sup. Ct. 205, 64 L. Ed. 542. Comparatively little help is to be had from decisions under section 3 of the act as originally passed, which was limited to specific intent to interfere with military operations, or actual attempt to cause mutiny, or actual obstruction of recruiting or enlistment.

[6] The indictment was therefore not subject to demurrer, unless for failure to state the name of the person or persons to whom the language set out in the indictment was addressed. In our opinion this omission was not fatal. While it is the general rule that the name of one injured either in his person or property by the act of the accused, or one whose identity is essential for the proper description of the offense should be stated in the indictment if known, or if not known, the failure to state it should be excused by the averment that it is not known; yet it is not usually necessary to state the names of persons only indirectly connected with the offense. Clark's Criminal Procedure, § 9. But whatever may be the decisions elsewhere, under the rule prevailing in the federal courts (where the practice of requiring bills of particulars is so thoroughly settled), we think the omission of the name of the person in whose presence the language in question was uttered does not vitiate the indictment. Kirby v. United States, 174 U. S. 47, 63, 19 Sup. Ct. 574, 580, 43 L. Ed. 890.[2]

---

[1] On the trial the jury was instructed that the language in question was not profane.

[2] In a common-law declaration for slander, it was neither necessary nor customary to set out the name of the person or persons to whom or in whose presence the alleged slanderous words were spoken. 17 R. C. L. title "Libel and Slander," § 141. The stock formula was "in the presence and hearing of divers persons." Puterbaugh's Pleading and Practice (3d Ed.) p. 478.

In the Kirby Case, which was a prosecution for feloniously receiving and possessing stolen postage stamps, with intent to convert them to the use of the accused, the objection that the indictment did not show from whom the accused received the stamps, nor state that the name of such person was unknown to the grand jurors, was held not well taken. After citing authorities to the proposition that the offense is not the receiving of stolen goods from any particular person, but receiving them knowing them to have been stolen, Mr. Justice Harlan said:

"We therefore think that the objection that the indictment does not show from whom the accused received the stamps, nor state that the name of such person was unknown to the grand jurors, is not well taken. If the stamps were in fact stolen from the United States, and if they were received by the accused, no matter from whom, with the intent to convert them to his own use or gain, and knowing that they had been stolen from the United States, he could be found guilty of the crime charged, even if it were not shown by the evidence from whom he received the stamps."

As applied to the instant case, it is not, as matter of law, material in whose presence the alleged offending words were spoken. It is only necessary that they be spoken in the presence and hearing of some person or persons. As said by Mr. Justice Harlan, following what has just been quoted:

"This rule cannot work injustice nor deprive the accused of any substantial right. If it appears at the trial to be essential in the preparation of his defense that he should know the name of the person from whom the government expected to prove that he received the stolen property, it would be in the power of the court to require the prosecution to give a bill of particulars."

That there is in the courts of the United States a well-settled practice of requiring and giving bills of particulars in criminal cases, for the purpose of informing a defendant with respect to time, place, and other details, and thus to enable him to meet the charge, appears by these further citations: Rosen v. United States, 161 U. S. 29, 34, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; Durland v. United States, 161 U. S. 306, 314, 315, 16 Sup. Ct. 508, 40 L. Ed. 709; Dunlop v. United States, 165 U. S. 486, 491, 17 Sup. Ct. 375, 41 L. Ed. 799; Bartell v. United States, 227 U. S. 427, 432, 33 Sup. Ct. 383, 57 L. Ed. 583; Elgin, etc., Co. v. United States (C. C. A. 7) 253 Fed. at page 910, 166 C. C. A. 7; May v. United States (C. C. A. 8) 199 Fed. 53, 61, 117 C. C. A. 431. And a bill of particulars, once made and served, "concludes the rights of all parties who are to be affected by it; and he, who has furnished a bill of particulars under it, must be confined to the particulars he has specified, as closely and effectually as if they constituted essential allegations in a special declaration." Commonwealth v. Giles, 1 Gray (Mass.) 466, cited in Dunlop v. United States, supra, 165 U. S. at page 491, 17 Sup. Ct. 375, 41 L. Ed. 799. Of course, a bill of particulars will not cure a fatal defect in an indictment.

In the instant case, the district judge, in his opinion overruling the demurrer, said:

"No doubt defendant is entitled to a bill of particulars setting forth the names of the persons to whom the language was addressed, if he wishes such information. The assistant district attorney, in open court, offers such information."

In the brief for the government it is stated (and without denial or criticism on defendant's part) that in open court, at the time of argument on the demurrer:

"The government, without motion being made by counsel, voluntarily offered to present to defendant forthwith a bill of particulars or specifications, setting forth in detail the exact street or building in Cincinnati where the statements were made, the exact time of the day they were uttered, together with the name or names of the persons to whom they were addressed, and any other information that defendant desired or felt himself entitled to, in order that he might better make his defense to the charges contained in the indictment. Counsel for Dierkes failed to avail themselves of this offer, and as a matter of fact stated that they did not care to accept it."

Under such circumstances, the lack of advice to defendant of the name of the person or persons to whom or in whose presence the offending words were spoken is not the fault of the law, or of the court below, or of the government. Defendant was therefore plainly not prejudiced by the lack of disclosure in question, and the practice prevailing in the courts of the United States forbids the reversal of a judgment for error which does not prejudice. Armour v. United States, supra, 209 U. S. at page 84, 28 Sup. Ct. 428, 52 L. Ed. 681; N. Y. C. R. R. Co. v United States, 212 U. S. 481, 29 Sup. Ct. 304, 53 L. Ed. 613; Elgin, etc., Ry. Co. v. United States (C. C. A. 7) 253 Fed. at page 910, 166 C. C. A. 7; U. S. Comp. Stat. § 1691; section 269 of the Judicial Code, Act March 3, 1911, c. 231 (36 Stat. 1163), as amended February 26, 1919 (40 Stat. 1181, c. 48 [Comp. St. Ann. Supp. 1919, § 1246]); West v. United States (C. C. A. 6) 258 Fed. 413, 415, 169 C. C. A. 429; Bain v. United States (C. C. A. 6) 262 Fed. 664, 669.

We see no merit in defendant's contention that the record is not such as to protect him against further prosecution for the same offense, for if in another prosecution the court should hold (contrary to what we understand to be the law) that the charge as contained in the indictment before us is too indefinite to permit the pleading of the conviction thereunder in bar of such further prosecution, defendant could readily protect himself by parol proof of the actual identity of the charge. Dunbar v. United States, 156 U. S. 185, 191, 15 Sup. Ct. 325, 39 L. Ed. 390, where in a prosecution for smuggling opium it was said that—

"Some parol testimony might be required to show the absolute identity of the smuggled goods, but such proof is often requisite to sustain a plea of once in jeopardy. It is no valid objection to an indictment that the description of the property in respect to which the offense is charged to have been committed is broad enough to include more than one specific article."

The same proposition is declared in Durland v. United States, supra, at pages 314, 315, against an objection that full information was not given of the contents or import of certain letters asserted to have been mailed in pursuance of a scheme to defraud; the court there saying:

"If defendant had desired further specification and declaration, he could have secured it by demanding a bill of particulars."

In Bartell v. United States, supra, 227 U. S. at page 433, 33 Sup. Ct. at page 384, 57 L. Ed. 583, the court said:

"In Durland v. United States, 161 U. S. 306, 315, it was held that a general description of a letter identified by the time and place of mailing, when it was mailed in pursuance of a scheme to defraud, was sufficient, in the absence of a demand for a bill of particulars. As to the objection that the charge was so indefinite that the accused could not plead the record and conviction in bar of another prosecution, it is sufficient to say that in such cases it is the right of the accused to resort to parol testimony to show the subject-matter of the former conviction, and such practice is not infrequently necessary"—citing authorities.

And these considerations effectually repel any danger of prejudice from the fact that defendant was shown (by testimony later stricken out) to have made to another person the same statements, and at about the same time, as those alleged to have been made to the witness Mohr, and which are made the basis of the charge here. It should go without saying that a bill of particulars, while not a part of the record (Dunlop v. United States, supra, at page 491, 17 Sup. Ct. 375, 41 L. Ed. 799), would itself furnish clear and indisputable evidence of the identity of the charge on which the conviction was had. In our opinion there is no escape from the conclusion that the judgment of conviction is not subject to reversal for insufficiency of the indictment.

[7] 2. The government was allowed to introduce considerable evidence of statements by defendant tending to show sympathy with the cause of Germany and hostility against participation by the United States in the war. These statements include the following:

"It is a great mistake to carry on this war; those s. o. b.'s at Washington will be sorry they have got into this war;" that the war was a "moneyed war." The statement, "I voted the Socialist ticket because I wanted Germany to win the war." Again, "Well, don't buy any Liberty bonds; what do you want them for; you might as well throw that money away; buy anything else," coupled with the statement that it was a Wilson war. Another statement, made by way of question to a young man about to enter the army, "What did Germany do to you, that you have got to wear Uncle Sam's uniform?" In another case, "The Allies had no chance whatever to win the war against Germany," and a statement that the President was allied with and favored the English. At another time, "This is a hell of a government, or we would not be drafting men into the army; we are no longer a free country; we are vassals of the British." In another case, that "President Wilson had been brought into the war through British influence," and that "we had no more right to declare war against Germany than we had against England." In another case, the statement that it was a big financial war profit for Wilson and a bunch of Eastern grafters, and that he had paid two young men's way to Honduras to escape the draft. In another case, saying to a young man wearing the uniform of a national rifle association, and who as he said was "trying to serve my country, trying to help the boys to learn to shoot, training them for future service": "Well, you will regret this some day anyway, when you see Wilson and that crowd at Washington with their heads lopped off at Jackson Park." In another instance, when asked whether he had bought any Liberty bonds, replying, "Liberty bonds—hell, to fight my own people with?"

A majority of these statements were alleged to have been made before the passage of the 1918 amendment to the Espionage Act, and all, with one exception, after the original passage of the act; but even this exceptional case is said to have occurred after the United States had entered the war. This testimony was all taken against defendant's objection, on the grounds, so far as seem important, that the

testimony was incompetent to prove intent, that it added nothing to the intent normally attending the words used in the indictment, that it raised new issues not presented by the indictment, and, further, as to the statements alleged to have been made previous to the amendment of 1918, that declarations lawful when made were used to show criminal intent under a later statute.

In our opinion the evidence was properly admitted. It tended to show an attitude of hostility toward the war and the participation of the United States therein, and a spirit of disloyalty toward the United States and a desire to bring its armies into disrepute. It thus bore directly upon the likelihood of defendant's using the language which forms the subject-matter of the two counts of the indictment with which we are concerned. That the court admitted the testimony for the purpose of showing intent, so far as that may be thought distinguishable from attitude of mind, could not work legal prejudice.[3] It was, in our opinion, clearly admissible as showing mental attitude, even if, as defendant insists, intent (strictly speaking) was not involved. So far as intent was involved, it was competently addressed to the subject. Schoborg v. United States (C. C. A. 6) 264 Fed. 1, 7–8, and cases there cited; Kirchner v. United States (C. C. A. 4) 255 Fed. 301, 304, 305, 166 C. C. A. 471; Wimmer v. United States, supra (C. C. A. 6) 264 Fed. at page 13. We see no support in principle for the contention that statements made previous to the passage of the amendment are for that reason inadmissible. Such a proposition was rejected by this court in Schoborg v. United States, supra (C. C. A.) 264 Fed. at page 9. Similar holdings have been made by others of the Circuit Courts of Appeals: Kirchner v. United States (4th Circuit) 255 Fed. 301, 304, 305, 166 C. C. A. 471; Deason v. United States (5th Circuit) 254 Fed. 259, 260, 165 C. C. A. 547; Bold v. United States (9th Circuit) 265 Fed. 581, 584.

[8] 3. It was the government's claim that Mohr was the person in whose presence and hearing the language charged in the indictment was uttered. In fact, Mohr did not testify that defendant used the last sentence of the language alleged in the indictment, viz.: "Mohr would look like hell toting a gun in Wilson's Wall Street war." Defendant's language, as given by the witness Keefe, however, included that statement. Keefe's testimony was, on defendant's motion, subsequently stricken out in the jury's presence. In the charge the court mistakenly treated the sentence in question as included in Mohr's testimony, saying: "Mohr testified that the defendant used these words to him. The defendant denies it." Defendant now contends that the judgment should be reversed for this mistake.

There are several reasons which lead us to conclude that the judgment should not be reversed on this account. Admittedly the court was

---

[3] The actual instruction was this: "Such other statements are not evidence of the fact that he made the statements charged. They are permitted, if you find they were made, to go to you as tending to reflect upon his state of mind when he used the words he is charged with having used; that is to say, as reflecting upon his intention when he used them, if he used them, and they are only to be considered by you in that connection, as reflecting upon his intention, purpose, and state of mind."

not alone in his misapprehension in the respect stated. Defendant's counsel, upon his direct examination of defendant as a witness in his own behalf, called his attention to the statement in question, apparently on the theory that it had been testified to by Mohr, and defendant replied, "Probably I used something like that," saying in explanation that Mohr was "a puny, delicate kid, and the idea of his packing a gun, and with a great big bundle on his back, a soldier's kit—why, I didn't think of that—I couldn't think that possible." Accordingly the attention of the court was never called, during the trial or charge, or after the charge was concluded, to the fact that Mohr's testimony did not relate to the sentence now in question, although the matter was later made the subject of motion in arrest of judgment, which, however, lies only for material error on the face of the record, and does not include the testimony and the charge, and so could not avail defendant. Clark's Criminal Procedure, § 186; Towe v. United States (C. C. A. 4) 238 Fed. 557, 558, 151 C. C. A. 493; United States v. Erie R. R. Co. (Judge Haight; D. C.) 222 Fed. 444, 447-8. Indeed, defendant had the benefit of instruction to the jury, apparently based upon his own testimony, to the effect that if the expression "poor slob" referred to Mohr, if it was a mere jocular expression, applicable to his person and peculiarities, and if the statement that Mohr would look like hell toting a gun in Wilson's Wall Street war "was applicable to the figure Mohr would cut as a soldier, you would not be justified in finding these words disloyal, scurrilous, and abusive, and your verdict would be not guilty under the second count." This instruction (omitting the last clause) was expressly asked by defendant.

Moreover, even should the sentence we are considering be entirely eliminated, there still remained the statement, "I would rather serve a term in the penitentiary than wear a uniform in Wilson's Wall Street war," which is slightly, if at all, less significant than the later statement about Mohr's appearance in toting a gun. Under these circumstances we would not be justified in exercising the extraordinary authority to reverse the judgment, in the absence of exception directing the attention of the court to the misapprehension shared by both court and counsel, even if reversal would be called for had such exception been made. The force of defendant's practical admission that he made to Mohr the statement in question is not necessarily overcome either by the fact that he did not positively admit the language used (for it was open to the jury to conclude from his examination that he did make that statement in substance, especially as it was made when testifying as a witness in his own behalf and under examination by his own counsel), or by the fact that defendant insisted that his conversation with Mohr was in December, 1917, and not in June, 1918, and thus previous to the adoption of the amendment to the Espionage Act. Nor did the failure of the court to expressly instruct the jury not to consider Keefe's testimony (which had been stricken out as stated above) constitute reversible error, in the absence of request for such instruction.

[9] 4. Several of the witnesses whose testimony is referred to in the second pargaraph of this opinion (including Rogers and Hellwig) testi-

fied that defendant had referred to the war as "Wilson's Wall Street war." On defendant's motion the trial court struck out the evidence of those witnesses as to that point, suggesting the possibility that the ruling might later be changed. Defendant complains that the government's counsel cross-examined him with reference to the testimony of Rogers and Hellwig upon that point. The record shows that defendant, on his direct examination, had already testified that in his conversation with Mohr, which was made the subject of the indictment, he may have used the expression "Wilson's Wall Street war," stating, however, that he did not recall saying to Mohr or anybody anything like the words, "I would rather serve a term in the penitentiary than carry a gun in Wilson's Wall Street war." In the course of his direct examination he referred at considerable length to the attitude of several prominent newspapers, which had frequently used the expression "Wilson's Wall Street war," apparently in justification of an incidental use of that term by him.

Moreover, on his further direct examination he expressly denied making to the Government's witness Elzemann the statement testified to by that witness that the war was "nothing but a Wall Street war," which testimony had likewise been stricken out by the court on defendant's motion. On cross-examination, after saying generally that he had not stated "that this was Wilson's war," he qualified it by saying that he "did not habitually make that statement; I am telling you that that was current; I think a man gets into the habit of saying things." On further cross-examination he was asked whether he wished his general statement on cross-examination, that he had never said to any one, in terms, in speaking of the war, that it was "Wilson's Wall Street war," to cover also his conversation with Rogers. After replying that he wished it clear that any reference thereto "was a current reference, in current form, which was used before we were in the war, before we went into the war, the beginning of the war," he was asked whether he had ever made the statement, "leaving out repetitions or repeated statements or reports, or anything," to which he replied, "I won't answer, except with the reservation that it was not made with any intention to injure the war or to hurt any one." He was later asked whether he wished his general denial that he ever made such a statement to any one (referring to the term "Wilson's Wall Street war") to cover also the conversation with Miss Hellwig, to which he replied in the affirmative.

All the cross-examination in question, including the reference to the testimony of the witnesses Rogers and Hellwig, was given without objection on the part of defendant or his counsel, and presumably because counsel thought either that the cross-examination was justified or that defendant was not injured thereby. Defendant was represented by intelligent and able counsel. Plainly the trial court committed no error in not intervening on its own motion to prevent a cross-examination to which defendant apparently did not object. It is equally clear that the trial court did not commit reversible error in not instructing the jury, in connection with striking out the testimony of the several witnesses referred to, that they should not consider it. As defendant's

counsel say: "It is undoubtedly true that if it had been called to his [the court's] attention he would so have instructed the jury."

[10] 5. With the exception about to be noted, we have now considered all the arguments presented on defendant's behalf, by brief and orally, and we have discussed them so far as they seem to call for discussion. The exception is this: It is urged that the language set forth in the indictment cannot be construed as abusive or disloyal as related to the military or naval forces of the United States, or as intended to bring those forces into contumely and disrepute, and that no crime is either charged or proven. We are unable to agree with this contention.

The occasion for speaking the language charged in the indictment, according to Mohr's testimony, was this: On his telling defendant, in the latter part of May or early art of June, 1918, that he (Mohr) was likely to be called into service soon because he was in the draft, defendant talked about "Wilson's Wall Street war, and about [how?] he would hate to be in it," and upon being told by Mohr that he did not "relish hearing any abuse of the President, because I had a brother that was a member of the 148th infantry, and I expected him to be sailing for France in a few days," defendant said:

"The poor slob [inferably meaning Mohr's brother]. I would rather serve a term in the penitentiary than wear a uniform in Wilson's Wall Street war."

There was substantial evidence (we have not attempted to set it all out, even in substance) tending to support a conclusion that at the time the words in question were spoken defendant, who was of German parentage, entertained strong pro-German sympathies, not merely as between Germany and Great Britain, but as between the United States and Germany; that he was hostile to the entry of the United States into the war, and that he still hoped and expected that Germany would win. The weight and sufficiency of this evidence (including the extent to which it might be thought to be explained or otherwise by defendant's testimony) is not within our province to consider. That subject was addressed to the jury alone. Matthews v. United States (C. C. A. 8) 192 Fed. 490, 113 C. C. A. 96; Kelly v. United States (C. C. A. 6) 258 Fed. 392, 406, 169 C. C. A. 408, and citations in note. If the jury believed that defendant entertained the sentiments which, as we have said, there was competent and substantial evidence tending to show, it was reasonably open to it to conclude that the language in question was uttered in a spirit of disloyalty as respects the fighting forces of the United States, and with the intent to bring those forces into disrepute.

Finding no reversible error in the record, the judgment of the District Court is affirmed.