Wilkes T. Thrasher and E. B. Baker, both of Chattanooga, Tenn. (J. M. C. Townsend, of Chattanooga, Tenn., on the brief), for appellants.

J. B. Frazier, Jr., of Knoxville, Tenn. (James B. Frazier, Jr., U. S. Atty., and Wm. E. Badgett and Ferdinand Powell, Jr., Asst. U. S. Attys., all of Knoxville, Tenn., on the brief), for appellee.

Before ALLEN, HAMILTON, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

Another tragic chapter has been written in the bloody book of an age-old history of resistance by lawless mountain clans to enforcement of the Internal Revenue Laws of the United States. From the family burying ground of the Clan McNabb, a death dealing shot was fired in the dark upon a Federal Alcohol Tax Unit Investigator, while in the performance of his official duty.

Five McNabbs were indicted on the charge of murdering the officer. Freeman and Raymond McNabb, twin brothers, and their cousin, Benjamin McNabb, were convicted of murder in the second degree, were sentenced to forty-five years' penal servitude, and have appealed. The other two McNabbs, Emuil and Barney, were acquitted on directed verdicts with the approval of the Government attorney.

The killing occurred in Marion County, in a mountainous section of eastern Tennessee known as the McNabb Settlement, long inhabited by that family.

The murdered federal officer, Samuel Leeper, had accompanied, in an automobile, three fellow officers in the Internal Revenue Service on a raid, guided by two informers by whom arrangements had been made to purchase some seventy-five gallons of untaxpaid whiskey from members of the McNabb family. The four revenue officers met the two informers at an appointed place on July 31, 1940, around 8:45 or 9 o'clock P. M., drove with them in a separate automobile, and parked their car about one-half mile from the spot where the whiskey was to be delivered. Thence, they rode toward the McNabb Settlement in an automobile driven by one of the informers, who was accompanied by the other. While driving up the "McNabb Road," they saw some persons ahead, whereupon informer Davidson cut off the lights of the automobile and the officers alighted from the car. The two informers then proceeded to drive down the road to a point where they found Benjamin, Freeman, Raymond, Emuil and Barney McNabb awaiting them.

The arrangements made between the informers and the McNabbs had been to have the whiskey delivered at a barn; but, when the informers arrived, they were told that the whiskey was cached near a gate to the family cemetery. All five of the defendants were identified as present to participate in the delivery of the illicit liquor.

The car was driven into a hog lot and turned around near the edge of the cemetery. Three of the McNabbs and one of the informers were engaged in carrying the whiskey in five-gallon cans to the car when, by pre-arranged signal to the officers, informer Davidson flashed a flashlight on the front wheel of the automobile. The four Revenue Officers started forthwith on a run toward the car. One of the officers exclaimed, "All right, boys, Federal Officers!"

The three convicted McNabbs ran into the cemetery; the two acquitted McNabbs also made their escape. As the federal officers closed in, the informers drove the automobile past them and departed as previously planned.

The officers ran to the cemetery gate. Having failed to apprehend any of the McNabbs, three of the officers, including Leeper, proceeded to empty the five-gallon whiskey cans found there. One of the officers left to bring their automobile. While the remaining officers were emptying the whiskey, a rock was thrown toward them.

Officers Renick and Abrams stood waiting for the cans to drain. Officer Leeper climbed over the cemetery fence and, with lighted flashlight in hand, was pouring out the contents of two cans of whiskey found within the cemetery when he

was fatally shot by the discharge from a shotgun. Apparently, the gun was fired from behind an oak tree near the center of the cemetery. Though peppered with gunshot, Leeper drew his pistol and commenced firing.

One of the officers, Renick, ran to the aid of his stricken comrade. "Where did he go, Sam?" He asked. "Behind that big rock!" Leeper replied. Renick fired two shots.

"About three minutes after the first shotgun was fired," Renick narrated at the trial, "there was a second shotgun shot and I was struck by four or five pellets or shots in different places of my face and body, and the shots apparently came from a different direction. At the time of the second shot, I realized that my flashlight would make a good target and I turned it off and walked back to where Abrams was and I said, 'maybe they will get you too.'"

Leeper passed away a few minutes after Renick was shot. Officer Jones, who had gone for the automobile, returned to the scene and, when informed of the situation, went to the nearby house of Jim McNabb and brought back with him a boy, Lawrence McNabb, who assisted the officers in placing the decedent's body in the automobile. The only other McNabb who appeared was a woman who said she was the wife of Barney McNabb. Pursuant to the request of Officer Jones, who rejoined them some twenty minutes after the shooting, the two informers summoned an ambulance, to which the dead body was transferred near the Marion County line and carried into Chattanooga.

Freeman, Raymond and Emuil McNabb were arrested on the night of the murder, brought into Chattanooga and placed in the bull pen in the office of the United States Marshal around two o'clock in the morning. Barney McNabb was arrested the following morning, and Benjamin McNabb, accompanied by his mother and father, surrendered himself to arrest on August 2nd, saying that his mother had been told by the officers that they wanted him to come in.

After their incarceration, the five defendants, some times together, at other times separately or in groups, were repeatedly questioned concerning the crime by numerous Alcohol Tax Unit Investiga-

tors. The nature of these interrogations presents the usual conflict in testimony between the accused on the one hand and the officers on the other.

The version of the defendants was that, deprived of food, they were confined in the bull pen of the United States Marshal's office, without beds or chairs, from two o'clock in the morning of August first until five o'clock that afternoon, when they were transferred to the county jail where they were served cheese sandwiches. After a short surcease, they were returned to the Federal Building and interrogated until midnight before being taken back to the county jail.

Before noon next morning, they were again conducted to the Federal Building and examined at intervals until two o'clock of the following morning. They say that, within this period, they were aroused from bed in the county jail around ten P. M., retaken to the Federal Building and there, surrounded by Federal Revenue Officers, were abused, cursed, threatened, accused of lying, and promised lighter punishment should they tell the truth. An acquitted defendant, Barney McNabb, was struck on the head with a book, according to his testimony—not given, however, before the jury. None of their friends, relatives, or counsel were present while the McNabbs were being questioned.

The federal officers sharply contradicted the testimony of the accused, asserted that the defendants were furnished sufficient food and drink; and denied that any promises, inducements, or threats were made, or that any intimidation, coercion, physical violence, or undue pressure was exercised. The officers asseverated that the self-incriminating statements of the defendants were voluntary.

The District Supervisor of the Alcohol Tax Unit, Bureau of Internal Revenue, who was in charge of the investigation, testified: "I told each of them (the five defendants) before they were questioned that we were Government Officers, what we were investigating, and advised them they did not have to make a statement, that they need not fear force and that any statement made by them would be used against them and that they need not answer any questions asked unless they desired to do so, and I asked each of them if he understood that. I talked to each of them individually and each of them said

he so understood. I told them that if they did answer the questions to tell the truth, but that they had a right to refuse to answer if they wished. \* \* \* I have never threatened or abused any defendant in my life and I have been in the law enforcement work fifteen years. \* \* \* When I knew the truth I told the defendants what I knew. I never called them damn liars, but I did say they were lying to me."

■ (1) Before receiving in evidence any purported incriminating statements of the defendants which the Government sought to prove had been made to the officers, the trial judge ordered the jury to retire from the courtroom, and during the exclusion of the jury he heard at length and in detail testimony of officers, defendants and other witnesses. This was in conformity with established proper practice. Cohen v. United States, 7 Cir., 291 F. 368; Mangum v. United States, 9 Cir., 289 F. 213; Hale v. United States, 8 Cir., 25 F.2d 430; Wilson v. United States, 162 U.S. 613, 624, 16 S.Ct. 895, 40 L.Ed. 1090.

Upon the conclusion of this hearing, the judge, for announced reasons, ruled that any statements made by the defendants "under the conditions as submitted to the court" were admissible in evidence. The trial to the jury proceeded and a number of revenue officers testified to admissions made by the defendants.

None of the defendants testified before the jury.

■ Assigning error, the appellants charge that the admissions or confessions were not free and voluntary, but were obtained by "duress, coercion and hope of reward to the extent that the will and mind of the appellants were subjugated."

The assignment must be overruled. The record reveals no situation remotely comparable to the plight of the defendants depicted in Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, or in Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682. No circumstances calculated to inspire terror or coerce free will have been shown in the instant case.

■ A free, voluntary confession, made without compulsion or inducement of any sort, is admissible in evidence. Where the evidence conflicts as to whether the confession is voluntary, if the court decides that the confession is admissible, the jury should be instructed to reject the confession if upon the whole evidence they find that it was not voluntary. Wilson v. United States, 162 U.S. 613, 624, 16 S.Ct. 895, 40 L.Ed. 1090.

In Sparf v. United States, 156 U.S. 51, 55, 715, 15 S.Ct. 273, 275, 39 L.Ed. 343, it was said that "confinement or imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary, and was not obtained by putting the prisoner in fear or by promises."

■ When both affirmation and denial of a voluntary confession are in evidence, the issue of truth must be decided by the jury. In instructing the jury, the District Judge carefully guarded the rights of the defendants: "Before you can consider the confessions of the defendants, or any of them, you must find they were voluntarily made. You take into consideration the facts and circumstances before you on this subject, the way and manner by which said confessions and admissions were obtained, and if they were warned that what they said might be used against them. It is sufficient if a confession is voluntarily made after having been warned or advised, and made without the aid of counsel and made to officers while in custody; but if the confessions or admissions were not of a free and voluntary nature, then you will entirely disregard such confessions or admissions. In passing upon these questions you will consider the age and experience, the station in life and the physical condition of the defendants making such statements, whether they had friends or relatives or counsel present, whether the questioning was carried on in a reasonable manner or not, whether they were threatened, abused or forced to do acts against their will. If you conclude from the proof that the confessions or admissions were not the free and voluntary acts of the defendant, then you will disregard them and not consider them at all in your deliberations. It is for you to determine what credit you will give to the confessions in an effort to arrive at the truth in the case."

(2) Error is assigned to the action of the District Court in admitting the testimony of two Government witnesses, Jones and Larkin, whose names were omitted from the list of witnesses furnished de-

fendants. The predicate of the assignment is non-compliance with the mandate of Section 1033 of the Revised Statutes, 18 U.S.C.A. § 562, which provides: "When any person is indicted of treason, a copy of the indictment and a list of the jury, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each juror and witness, shall be delivered to him at least three entire days before he is tried for the same. When any person is indicted of any other capital offense, such copy of the indictment and list of the jurors and witnesses shall be delivered to him at least two entire days before the trial."

■ This statute is mandatory. Logan v. United States, 144 U.S. 263, 304, 12 S. Ct. 617, 36 L.Ed. 429; Wilson v. United States, 5 Cir., 104 F.2d 81; Brown v. United States, 61 App.D.C. 359, 63 F.2d 136.

In the Logan case, the Supreme Court said: (144 U.S. op. 304, 12 S.Ct. op. 630, 36 L.Ed. 429) "The words of the existing statute are too plain to be misunderstood. * * * The list of witnesses required to be delivered to the defendant is not a list of the witnesses on whose testimony the indictment has been found, or whose names are indorsed on the indictment; but it is a list of the 'witnesses to be produced on the trial for proving the indictment.' The provision is not directory only, but mandatory to the government; and its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense. Being enacted for his benefit, he may doubtless waive it, if he pleases; but he has a right to insist upon it, and if he seasonably does so the trial cannot lawfully proceed until the requirement has been complied with."

It was observed, further (144 U.S. at page 307, 12 S.Ct. at page 631, 36 L.Ed. 429), that "the statute does not make a defendant's right to a list of the witnesses to be called against him depend upon the degree of the crime of which upon trial he is ultimately convicted, but upon the degree of the crime for which he is indicted."

It is important to observe that the Supreme Court found it unnecessary "to express a definitive opinion upon the question whether the omission to deliver the list of witnesses to the defendants would of itself require a reversal of their conviction and sentence for less than a capital offense, inasmuch as they are entitled to a new trial upon another ground." Appellants have presented no decision where a judgment of conviction has been reversed upon the basis of non-observance by the Government of the statute which they invoke. The dicta in the Logan case does not preclude the view that the failure of the trial court to require compliance with the mandatory statute was harmless error.

■ In our judgment, the error was, in fact, harmless. The testimony of the two witnesses whose names did not appear on the list was merely cumulative on material matters. Both had testified before the Commissioner at the preliminary hearing. Both had been sworn and had answered several questions before defendants' attorney challenged their right to testify. No element of unfair surprise has been shown and no prejudicial invasion of the rights of the defendants appear. The omission of the names of the two witnesses from a long list was obviously an unintentional, non-prejudicial error. Counsel for the defendants did not even suggest the entry of a mistrial order or request a continuance when their objection was overruled. Both in the trial court and here, the attorneys for the defense have stood frankly on the technical applicability of the statute.

Section 269 of the Judicial Code, as amended, provides: "All United States courts shall have power to grant new trials, in cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law. On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 28 U.S.C.A. § 391; R.S.Sec. 726; Mar. 3, 1911, c. 231, Sec. 269, 36 Stat. 1163; Feb. 26, 1919, c. 48, 40 Stat. 1181.

■ In a criminal case, this court, applying the statute quoted, held that conviction will be reversed only where it appears that there has been committed a plain and vital error indicating a miscarriage of justice in the result. Westfall v. United States, 6 Cir., 2 F.2d 973. See, also, Stetson v. United States, 6 Cir., 257 F. 689, 693; Dierkes v. United States, 6 Cir., 274 F. 75. In civil cases, our court has likewise held that if the record fair-

ly indicates that the error was not prejudicial, a reversal is not necessary. Mitchell v. Pittsburgh, etc., R. Co., 6 Cir., 13 F.2d 704, 705. In Morton Butler Timber Co. v. United States, 6 Cir., 91 F.2d 884, 890, we said: "An error must be deemed harmless, if upon examination of the entire record substantial prejudice to the complainant does not appear." The statute in terms applies to both criminal and civil cases.

Other United States Circuit Courts of Appeal have applied the harmless error statute (Section 269 of the Judicial Code) in upholding convictions, in criminal cases, where on the whole record no prejudicial error appeared. Bruno v. United States, 9 Cir., 67 F.2d 416, 421; Johnson v. United States, 9 Cir., 59 F.2d 42, 43, 46; Lewis v. United States, 9 Cir., 38 F.2d 406, 410; Haywood v. United States, 7 Cir., 268 F. 795, 798; Claiborne v. United States, 8 Cir., 77 F.2d 682, 690; Green v. United States, 10 Cir., 93 F.2d 537, 539.

Without reference to the statute, it has been held in still other circuits that a judgment of conviction in a criminal case should not be reversed for harmless error. Martin v. United States, 10 Cir., 100 F.2d 490, 497; Linn v. United States, 2 Cir., 251 F. 476, 483.

On the whole record, there appears no resultant prejudice to defendants from the omission of the names of two witnesses from the long list furnished the defendants by the Government in conformity with Section 1033 of the Revised Statutes, 18 U.S.C.A., § 562.

(3) Appellants assert that the District Court erred in refusing to charge, at their request, that "if the defendant or defendants thought that the deceased Samuel Leeper was a hi-jacker or robber, and that he was present in the McNabb Cemetery for the purpose of stealing or taking by force of arms the whiskey involved, then the owner or owners of such whiskey would have had the right to use such force as was necessary to prevent the taking of said whiskey, and if they used no more force than was necessary then they would not be guilty; but if more force than was necessary was used, then this would reduce the degree of homicide to manslaughter."

This requested instruction was properly refused. The defendants were not defending their "castle." The deadly shot was fired from ambush. In the circumstances, there could be drawn no reasonable inference that the killing was in the sudden heat of passion. Cooling time had intervened. The crime committed does not reduce to voluntary manslaughter.

Moreover, as Joel Prentiss Bishop has truly declared in his authoritative Treatise on Criminal Law (Ninth Edition): "Life being superior to property, no one has the right to kill another in defense of the latter; yet by less extreme means, one may defend his own (Sec. 706, Vol. 2). * * A man may defend his property by any force necessary under the circumstances, such as assault and battery, short of taking the aggressor's life. But rather than slay him, he must yield and find his protection in the courts." (Sec. 875, Vol. 1)

(4) Appellants complain further that, at their request, the District Court should have charged the jury that the defendants could not be convicted unless they knew or had reasonable grounds to believe that the murdered man was a government officer. They charge error also in the refusal of the court to direct a verdict of acquittal for the reason that the appellants "did not have notice or knowledge that the deceased was an officer connected with the Internal Revenue Department of the United States of America at the time the fatal shot was fired."

Refutation of this specious argument is found in the plain language of the statute: "Whoever shall kill, as defined in sections 452 and 453[1] of this title, any United States Marshal * * * any officer, employee, agent, or other person in the serv-

---

[1] "§ 452. (Criminal Code, section 273.) Murder; first degree; second degree. Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree." (R.S. Sec. 5339; Mar. 4, 1909, c. 321, Sec. 273, 35 Stat. 1143). 18 U.S.C.A., § 452.

"§ 453. (Criminal Code, section 274.) Manslaughter; voluntary; involuntary.

ice of the customs or of the internal revenue * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, * * * shall be punished as provided under section 454 [2] of this title." 18 U.S.C.A. § 253, inclusive of amendment of June 13, 1940, c. 359, 54 Stat. 391.

■ To be amenable to punishment under this section of the Criminal Code of the United States, the killer need not know that he is killing an officer, agent or employee of the United States. The ingredient of the crime condemned is the unlawful killing of a human being in some manner defined in Sections 452 and 453.

■ Jurisdiction in the federal courts under Section 253 stems from the actuality that the person killed is a designated federal officer, engaged in the performance of his official duties. In the language of the statute quoted in excerpt, no exemption is expressly made of a killer who does not know that he is killing a federal officer of a class covered by the statute. Exemption may not be implied. The words and the intent of the statute are clear beyond the necessity for any canonical construction. The statute says, "whoever shall kill," not "whoever shall kill with knowledge that he is killing" a federal officer of an enumerated class, shall be punished.

Suhay v. United States, 10 Cir., 95 F.2d 890, cited by appellants, in no aspect gainsays our interpretation of the statute.

(5) Appellants insist that the evidence was insufficient, as a matter of law, to sustain a conviction of murder in the second degree and that it was the duty of the District Court to direct the jury to return a verdict of not guilty of murder in the second degree.

■ In considering this insistence, a United States Circuit Court of Appeals must conform to the function prescribed by the Supreme Court that the examination of the record in a criminal case is "not for the purpose of weighing conflicting testimony, but only to determine whether there was some evidence, competent and substantial, before the jury, fairly tending to sustain the verdict." Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 18, 63 L.Ed. 1173.

Or, as stated in Burton v. United States, 202 U.S. 344, 373, 26 S.Ct. 688, 695, 50 L. Ed. 1057, 16 Ann.Cas. 362: "It was for the jury to pass upon the facts; and, as there was sufficient evidence to go to the jury, this court will not weigh the facts, and determine the guilt or innocence of the accused by the mere preponderance of evidence, but will limit its decision to questions of law."

■ In Ryan v. United States, 8 Cir., 99 F.2d 864, it was held that on appeal from a judgment of conviction, the reviewing court, in passing on the question of sufficiency of evidence, is required to accept that view most favorable to the government, inasmuch as the jury has found the appellant guilty. Cf. Knable v. United States, 6 Cir., 9 F.2d 567.

Again, in Pierce v. United States, 252 U.S. 239, 252, 40 S.Ct. 205, 210, 64 L.Ed. 542, the functions of judge and jury are plainly demarked: "There being substantial evidence in support of the charges, the court would have erred if it had peremptorily directed an acquittal upon any of the counts. The question whether the effect of the evidence was such as to overcome any reasonable doubt of guilt was for the jury, not the court, to decide."

There is direct evidence in the record that when the two informers arrived near the spot where the revenue officer was subsequently killed, the three appellants were there, with the two McNabbs who were

---

Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"Voluntary—Upon a sudden quarrel or heat of passion.

"Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (R.S. Sec. 5341; Mar. 4, 1909, c. 321, Sec. 274, 35 Stat. 1143.) 18 U.S.C.A. § 453.

[2] "§ 454. (Criminal Code, section 275.) Punishment; murder; manslaughter.

Every person guilty of murder in the first degree shall suffer death. Every person guilty of murder in the second degree shall be imprisoned not less than ten years and may be imprisoned for life. Every person guilty of voluntary manslaughter shall be imprisoned not more than ten years. Every person guilty of involuntary manslaughter shall be imprisoned not more than three years, or fined not exceeding $1,000, or both." (R.S. Secs. 5339, 5343; Mar. 4, 1909, c. 321, Sec. 275, 35 Stat. 1143). 18 U.S.C. A. § 454.

acquitted. The informers were told that the whiskey would not be loaded at the barn as pre-arranged, and were directed to drive down a little road to the cemetery. Three of the McNabbs, Raymond, Benjamin and Emuil, placed themselves on the side of the informers' automobile and rode down to the cemetery gate, where the car was turned around. Raymond and Benjamin McNabb were assisting Informer Davidson and Barney McNabb in carrying the whiskey from the cemetery to a location near the cemetery gate, when someone ran across the hill and shouted, "Don't load! Something funny!" Informer Davidson then flashed his flashlight as a signal to the revenue officers. As the officers ran in, the two informers jumped into the automobile and drove away, stopping when over the hill a quarter or half mile away to meet Officer Jones, as planned.

A description of the action at the time of the killing has been given heretofore and will not be repeated.

Only the admissions and confessions of the defendants, as related by several Alcohol Tax Unit Investigators on the witness stand before the jury remain to be summarized, to complete a survey of the substantial evidence upon which the jury convicted appellants.

The statements of Benjamin McNabb will be first considered. According to the testimony of the investigators who questioned him, Benjamin McNabb stated that when he left his home he was unarmed, that he crossed the Tennessee River and, in the late afternoon, before dark, arrived at the McNabb Settlement where he met three persons and was told that his liquor had been sold to two people. He objected on the ground that the persons named were "hi-jackers" and might "hi-jack" the liquor, but later withdrew his objection and agreed to the sale. He was with the party which met the informers' automobile, and his statement was in substantial conformity with the testimony of Officers Renick and Abrams and Informer Davidson as to the driving of the informers' automobile to the cemetery gate and the transportation of the liquor to that conveyance. While he was assisting in carrying liquor to the car, someone exclaimed, "Look! There comes the law!" He ran, and lost his black hat in his flight. The hat, identified by him, was found on the ground in the hog lot.

His statements varied as to whether he ran through the graveyard or away from it, but he admitted throwing a rock toward the officers who were pouring the liquor out of the cans. He said that he met Freeman and Raymond McNabb at a gate at the northeast corner of the cemetery. The gate near which the liquor had been cached was to the south. According to his statement, when he asked them what he should do, Freeman handed him a shotgun and a flashlight, and Raymond said, "Pour it on them!" Raymond McNabb consistently denied this, and insisted that he told Benjamin not to shoot. Freeman denied meeting Benjamin and Raymond at the cemetery corner and handing the gun to the former.

Benjamin McNabb admitted firing the fatal shot, saying that he fired from a position in the rear of the graveyard fence. He denied firing the second shot and contended that he merely heard it as he ran down hill to Jim McNabb's house. At another time, however, he said that he did not hear the second shot until he arrived at the house. He stated that after he had fired, he gave the gun to Raymond and that Freeman gave him another shell to load into the shotgun. A shotgun shell was found about twenty-five yards north of the graveyard.

Benjamin McNabb, according to the testimony of the Assistant District Supervisor of the Alcohol Tax Unit, marked on a crude pencil-drawn map, introduced in evidence, the course of his various movements.

From the review which has been made, there was certainly ample evidence upon which the jury could properly convict the killer, Benjamin McNabb, of murder in the second degree.

The statements of Freeman and Raymond McNabb will be now considered. It should be commented that the District Judge was careful in his effort to avoid consideration by the jury of an admission or confession of one defendant as evidence against another. In the hearing of the jury, the witnesses were required to substitute "persons" for the names of individuals referred to by any suspect when making his voluntary statement, describing his own actions.

Furthermore, the jury were charged that "any confession or admission introduced in evidence is competent evidence only

against the person making it, unless some other defendant was present and agreed that the statement was true. If any other defendant was present at the time and denied the statement made in the confession, then it cannot be considered as evidence against the defendant so denying it."

Inasmuch as Benjamin McNabb was the proven killer, the guilt or innocence of Freeman McNabb and Raymond McNabb of second degree murder turns upon whether they were aiders and abettors in the crime.

Section 332 of the United States Criminal Code provides: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal." 18 U.S.C.A. § 550.

According to the testimony of the investigators, Freeman McNabb admitted that he arranged for the sale and delivery of the illicit whiskey, that when he went up the road on the evening of the tragedy he carried a shotgun because he "thought someone might try to get his whiskey * * and he meant to shoot anybody who tried to take his whiskey." He also admitted that he carried the flashlight which was subsequently found in the cemetery between the spot where the decedent Leeper was shot and the white oak tree, from near which Raymond said the shot was fired. Benjamin McNabb asserted that he had returned the flashlight to Freeman and that it was not in the former's possession while he was in the graveyard.

Freeman McNabb admitted that he was the person who shouted, "Here comes the law!" But he immediately changed his admission as to what he exclaimed to, "Look out! It is three men!" His statement substantiated the testimony of the federal officers as to occurrences prior to the shooting. He stated that he stayed behind the automobile, so that if "hi-jackers" did get after his whiskey he would keep them from getting away with it.

From the circumstances which have been related, from the fact that his flashlight was found in the cemetery, and from the fact that he carried a gun with admittedly malevolent intent, the jury could readily infer that Freeman McNabb aided and abetted the killing of Officer Leeper.

From the testimony of the investigators, it appears that Raymond McNabb admitted that he heard his twin brother, Freeman, shout, "Look out! Here comes the law!" and that he ran through the graveyard to Jim McNabb's house but returned later to the cemetery fence corner at the rear gate, where he met his brother and Benjamin McNabb, though he denied that he told the latter to "pour it on them." At another time, he said that he ran through the upper end of the graveyard, around to the rear cemetery gate, where he met the two. He did not at any time deny meeting his brother and Benjamin at the little cemetery gate before the shooting. He admitted that he was behind the graveyard and saw Benjamin McNabb fire the fatal shot. His first description was that Benjamin went to the center of the cemetery and from near a big tree fired two shots as rapidly as he could fire, re-load and fire again. He immediately changed this statement, however, and said that Benjamin fired only one shot from near the tree and that when the second shot was fired, he (Raymond) was running down hill.

The court carefully charged the jury that a person would not be guilty of murder simply because he was present when the murder was committed and where there was nothing to indicate that he had participated therein directly, or was "aiding or abetting, counseling, commanding or procuring the murder."

Upon his own description of his movements, the circumstantial evidence and the whole proof, Raymond McNabb who, after running away from the officers, met and stood in ambush nearby the killer when the fatal shot was fired, could, with reasonable justification, be found guilty of aiding and abetting second degree murder. The verdict of the jury should be upheld.

The judgment and sentence of the District Court, as to each of the three appellants, is affirmed.