**John Seiko GINOZA, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 15278.**

United States Court of Appeals
Ninth Circuit.

June 6, 1960.

Chambers, Barnes and Hamlin, JJ., dissented.

Howard K. Hoddick, Daniel G. Ridley, Honolulu, Hawaii, for appellant.

Louis B. Blissard, U. S. Atty., Honolulu, Hawaii, for appellee.

Before STEPHENS, POPE, CHAMBERS, BARNES, HAMLEY, HAMLIN, and JERTBERG, Circuit Judges.[1]

HAMLEY, Circuit Judge.

John Seiko Ginoza appeals from his conviction on one count of a four-count indictment charging violations of the narcotics laws.[2] Seven errors, one consisting of three parts, are specified. We find specifications of error 1, 2, 3, 4, 5(a), 5(c), 6, and 7 to be without merit.

Under specification 5(b) appellant argues that the trial court erred in denying his motion to strike testimony given by law enforcement officers concerning statements and admissions made by him after his arrest and prior to being taken before a committing magistrate. Contending that such statements and admissions were made while his appearance before a committing magistrate was being unlawfully delayed, Ginoza invokes Rule 5(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., and the exclusionary rule announced and applied by the Supreme Court in McNabb, Upshaw, and Mallory.[3]

For the reasons stated below, we hold that specification of error 5(b) is well taken and that the judgment must therefore be set aside and the cause remanded for a new trial on Count III.

It is first necessary to set out in some detail the circumstances surrounding appellant's arrest and interrogation. In doing so we rely exclusively upon the testimony of witnesses called by the prosecution.

Ginoza is a resident of Honolulu. In October 1955 he made a trip to Japan. Customs officials and the agents of the Federal Bureau of Narcotics then assigned to the Territory of Hawaii were aware of Ginoza's departure by airplane for Japan, and were informed that he would return from Japan by airplane on December 13, 1955. At that time they regarded Ginoza as a prime suspect as an illegal importer of narcotics.

---

1. After the case was submitted en banc, Circuit Judge William Healy retired on November 30, 1958, and has not participated in the decision. Also, after submission the death of Circuit Judge James Alger Fee occurred on August 25, 1959.

2. Count III upon which he was convicted charged Ginoza with having wilfully, unlawfully, and feloniously received, concealed, and facilitated the transportation and concealment of 85.1 grains of heroin, after importation, knowing the said drug to have been imported into the United States contrary to law, in violation of 21 U.S.C.A. § 174.

3. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; and Mallory v. United States, 354 U.S. 449, 453, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

After his arrival at the airport at approximately 9:00 p. m. on December 13, 1955, a customs inspector made a very thorough search of Ginoza's baggage. This was done pursuant to special instructions apparently based on information which had reached the Honolulu office of the Federal Bureau of Narcotics.

Fifteen Japanese dolls listed on Ginoza's baggage declaration were examined but no incriminating evidence was found. A white powder contained in a package removed from a coat in Ginoza's suitcase was found to be grape sugar. This is a substance commonly used for the adulteration or cutting of narcotic drugs, principally heroin.

Ginoza was next taken into a separate room at the airport, where the customs agent in charge made a search of his person. Two notebooks were found in Ginoza's clothing. Ginoza was then questioned by the customs officers for thirty to forty-five minutes. The district supervisor of the Federal Bureau of Narcotics was also present and participated in the interrogation.

Ginoza was questioned concerning the dolls and the grape sugar. He pointed to the name of Tadeo Hirai, listed in one of the notebooks, as the person from whom he had purchased the grape sugar in Japan. Tadeo Hirai is also known as Frank T. Hirai. The officers were acquainted with Hirai, and knew that he resided in Honolulu. About two hours after his arrival at the airport Ginoza was released. All of his belongings were returned to him at that time except the package of grape sugar and the notebooks.

On January 4, 1956, officers of the Federal Bureau of Narcotics arrested Hirai and seized narcotics in his possession. They arranged to have him telephone Ginoza and make an appointment to purchase narcotics from Ginoza the following afternoon. Officers watched while Hirai, having first been searched, entered Ginoza's used car lot and returned with a brown bag containing 56.6 grains of heroin.

This incident was later made the basis of Counts I and II of the indictment filed against Ginoza, charging violations of 21 U.S.C.A. § 174, and 26 U.S.C.A. § 4704 (a). In the criminal trial which led to the instant appeal the jury was unable to agree as to Counts I and II.

Immediately after Hirai returned to the officers with the brown bag they went to Ginoza's place of business and placed him under arrest for violation of federal narcotics laws. The arrest was made between 3:15 and 3:30 p. m., on Thursday, January 5, 1956. The officers at once took Ginoza to the office of the district supervisor of the Federal Bureau of Narcotics, in the Federal Building, Honolulu. It was between 3:30 and 3:45 p. m. when they reached this office. As soon as they arrived at the office Ginoza was searched.

An intensive interrogation of Ginoza was then begun. The principal questioner was Robert W. Artis, district supervisor of the Federal Bureau of Narcotics. The other officers who were present during part or all of the questioning were Lowell William Cain and Jesse Joseph Bautista, narcotics agents; John R. Kent, customs agent in charge; John Williams, customs agent; and Roland Yee and Charles Gerlach, deputy United States marshals.

Ginoza was questioned concerning the persons he had talked to on that day; how long Ginoza had known Hirai; what Ginoza and Hirai had been talking about on that day; whether Hirai was the man named in the notebooks; and what Ginoza knew about the narcotics which Hirai had given to the officers. Ginoza insisted that he knew nothing at all about narcotics and that he was not involved in handling narcotics.

After about a half hour of such questioning without obtaining a damaging admission, the officers brought in Hirai and seated him next to Ginoza. A conversation then took place between Ginoza and Hirai. This led to an admission by Ginoza that he had brought into the Hawaiian Islands the heroin which Hirai had turned over to the officers just prior

to the arrest. The testimony of Artis concerning this episode is set out in the margin.[4]

This admission was made about 4:10 or 4:15 p. m. About five minutes later Narcotics Agent Cain telephoned to the office of United States Commissioner White, who had his office in the McCandless Building about five blocks away. Cain was informed by someone at Commissioner White's office that the commissioner had departed for home.

Cain's purpose in making this telephone call is not revealed by the record. In any event it was the first attempt which was made to get in touch with a commissioner for any purpose in connection with Ginoza's arrest. There was no immediate effort to reach Commissioner White at his home. White was the only commissioner on duty that day. Two United States district judges maintained chambers in the Federal Building. The record, however, does not indicate that any effort was made to ascertain their availability that afternoon.

After this telephone call to the office of Commissioner White, the questioning of Ginoza continued. In answer to the questions which were then propounded, Ginoza made several damaging statements and admissions. All of these, together with the original admission, were revealed to the jury in the testimony of Government witness Artis. The jury was told that during this part of the questioning Ginoza admitted that he brought the heroin into the Hawaiian Islands in a doll; that he had paid 136,000 yen for it; that he obtained the heroin from a rickshaw boy in Tokyo; that the heroin was packaged in three "papers"; and that the rest of the heroin was in his office, back of a door, describing the exact location.

Artis testified that during this questioning he was "trying to get out of him [Ginoza] the source of Supply." Government witness Cain testified that Artis questioned Ginoza "at great length." In the course of this question the officers went through the two notebooks with Ginoza page by page and name by name "in order to bring out something in that connection," as Artis put it.

At about 5:10 or 5:15 p. m. two officers were sent out to obtain a warrant to search Ginoza's place of business. While this was being accomplished, the questioning of Ginoza was resumed. Artis again went over the two notebooks with Ginoza in an effort to find out who had supplied the heroin and exactly how much had been brought in. In the course of this further questioning Ginoza again admitted that the heroin was in a doll. He also stated that the individual from whom he had purchased the heroin had packed the drug into the doll. These statements and admissions were passed along to the jury in the course of Artis' testimony.

About 5:30 p. m. the agents came back with a search warrant signed by Commis-

4. " * * * I asked him [Ginoza] to turn around and take a look at him [Hirai] and said, 'Is this the man Hirai that you have been talking about, the man you had in mind and whose name appears in these two notebooks?' 'Yes,' he said, 'that's the man.' Hirai at this juncture said to him, 'They know all about what happened and you'd just as well tell them the truth.' Ginoza made no reply to it or no indication of it at all. And he sat there maybe another five minutes or so and then he said, directing his question to me, 'Can I talk with this fellow?'— indicating Hirai alone. I said, 'No, I won't let you talk to him alone, but you can talk to him here.' And after a few minutes he said, 'All right.'

"And the two of them got up and moved away from my desk approximately six or seven feet and had a conversation there. I heard Hirai say Ginoza, 'You know they got me and I have told them all I know about it, and you just as well tell what you know about it.' Hirai said something else—not Hirai, but Ginoza said something else to Hirai that I could not understand. And then the two of them came back and sat down in the two chairs in front of my desk. Mr. Ginoza sat there for another five minutes and finally he looked over at me and said, 'Well, all right, I'll tell you about it.' I said, 'All right, what's the story? Did you bring this heroin in?' He said, 'Yes, I did.' "

sioner White. Presumably they had found the commissioner at his home, but this is not revealed in the record. There is nothing to indicate whether at the time the agents obtained the search warrant any inquiry was made as to the possibility of bringing Ginoza before Commissioner White that evening.

The officers then took Ginoza with them out to his place of business, arriving there about 5:40 or 5:45 p. m. Ginoza pointed to a section in the back wall of his office, indicating that heroin was hidden there. A cleat was pried from the wall at this place and two cellophane envelopes containing 86.9 grains of heroin were found. Ginoza was then asked to open his safe, which he did. No incriminating evidence was found in the safe. Ginoza then volunteered the statement that it was Hirai who put the heroin behind the cleat.

It was then about 6:30 p. m. The officers took Ginoza back to the Federal Building to be booked. On the next day, January 6, 1956, he was arraigned.

Counts III and IV of the indictment, involving, respectively, 21 U.S.C.A. § 174 and 26 U.S.C.A. § 4704(a), pertain to the heroin found behind the door in Ginoza's office after his arrest and questioning. He was found not guilty on Count IV, but guilty on Count III.

■ In view of the facts reviewed above it is our opinion that the admissions and statements in question were elicited in violation of Rule 5(a). The violation consisted of the interrogation of Ginoza at a time when his arraignment before a committing magistrate was being unnecessarily delayed, and during the course of which the admissions and statements were obtained.

■ In Mallory v. United States, 354 U. S. 449, at page 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479, it was held in effect that the words "without unnecessary delay" as used in Rule 5(a) mean "as quickly as possible" after booking and attending to such matters, inoffensive under Rule 5, as attempting a "quick verification through third parties" of a "story volunteered by the accused."

When Ginoza was brought to the Federal Narcotics Bureau office about 3:30 or 3:45 p. m., he was first searched. It is doubtless permissible under Rule 5(a) to search an arrested person prior to arraignment. After the search was completed he was not booked. Nor did the officers spend any time checking a volunteered story through third persons, there being no "volunteered" story. Instead, the officers began an immediate interrogation of Ginoza. Without expressing a view as to whether it would make any difference, it is plain that this questioning was not confined to an attempt to discover the source of supply of the narcotics.

After obtaining an oral confession about 4:10 or 4:15 p. m., the first effort was made to contact a commissioner. The officer who then made a telephone call to the nearby office of Commissioner White was told that he had departed for home. It thus appears that Commissioner White was accessible all that afternoon, either at his office or home, except while en route from office to home.

Nothing to the contrary appearing in the record, the reasonable inference is that when federal officers obtained a search warrant from Commissioner White later that afternoon, they found him at his home. But wherever he was then found, it could not have been far from the Federal Building, for it took the officers not over twenty minutes to reach the commissioner, obtain the search warrant, and return to their office.

There is no specific testimony to the effect that the commissioner would have conducted an arraignment at his home or wherever he was found after he left his office. But it may reasonably be inferred from the evidence that he would have done so if requested. We know that the commissioner did, at that place, perform the official duty of issuing a search warrant. We also know that he or the other Honolulu commissioner participated in the arraignment of Hirai on the previous evening, because Artis, the dis-

trict supervisor of the Federal Bureau of Narcotics, so testified.

■ These facts, it seems to us, establish prima facie that Ginoza could have been arraigned before Commissioner White either at his office or home, or wherever else he may have been, immediately after Ginoza was brought to the Bureau office and searched.[5] If there was some special reason why this could not have been done, the burden of going forward with the evidence to overcome this prima facie showing was upon the Government.

In view of the data and information about Ginoza which was then in the possession of the officers as a result of his interrogation by them on December 13, 1955, but little delay would have been required to complete the booking procedure and other matters not offensive to the provisions of Rule 5(a). In our view of the record further delay in taking Ginoza before the commissioner for arraignment was designed primarily for the purpose of enabling the officers to secure or to obtain the first oral confession referred to above.

In view of what has been said above the first admission obtained from Ginoza about 4:10 or 4:15 p. m. came during a time when his arraignment was being unnecessarily delayed. This is not a case like United States v. Mitchell, 322 U. S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, where an arrested person has promptly and spontaneously admitted his guilt. In the latter event, as the court there held, the admission may be received in evidence notwithstanding the fact that an unnecessary delay in arraignment thereafter occurred. Here, there was nothing spontaneous about Ginoza's admissions and damaging statements. Nor were they given promptly after his arrest. They were the product of intensive interrogation in private, surrounded only by law enforcement officers and after confrontation by an informer.

It follows from what has just been said that under the exclusionary rule announced in McNabb, Upshaw, and Mallory testimony concerning Ginoza's first admission was inadmissible.

If the initial admission was inadmissible, we need not concern ourselves with the subsequent admissions and statements. The reception of the initial admission would in any event require reversal.

■ If it be thought, however, that the initial admission was not the result of improper interrogation during illegal detention, the admissibility of testimony concerning the later admissions and statements must be considered. It would then be our view that since the subsequent admissions and statements came during a peroid of illegal detention reversal would be required whether or not the initial admission was deemed admissible.

We do not believe that testimony revealing such subsequent admissions and statements can escape the sanction of the McNabb rule (McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819) on the ground that it is only cumulative. We cannot read the jurors' minds and

---

5. Compare our recent decision in Williams v. United States, 9 Cir., 273 F.2d 781, in which it was held that under the facts there shown the trial court did not err in holding that there was no unnecessary delay in arraignment. The fact which there prevented the arrested person's arraignment before the commissioner's office closed for the day was his brief detention at his premises, following arrest, while a search was being completed. This court declined to overturn a trial determination that a brief delay for that purpose was not forbidden by Rule 5(a). The failure to present Ginoza at the commissioner's office, however, was not due to such a circumstance. In Williams the Government presented testimony showing that after the commissioner left his office for the day neither he nor another committing magistrate was available until the next morning. In the instant case the Government offered no such testimony. On the contrary, it may reasonably be inferred from the general testimony concerning the activities on the evening in question that a committing magistrate was available after office hours.

do not know what testimony they believed or disbelieved. For all we know, the jury, except for the "cumulative" testimony, might have concluded that the initial admission was unreliable in view of the circumstances under which it was given. They could hardly reach that conclusion after the "cumulative" evidence came in. Thus the latter may have been a substantial factor in obtaining the verdict of guilty on Count III.

It is true that there was no coercion or force used in connection with the extraction of any of the statements from Ginoza. Had there been, the objection to the admissibility of this evidence would have been placed on constitutional grounds rather than Rule 5. But, while aggravated circumstances existed in the McNabb case, and to some extent in Upshaw (Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed 100) and Mallory, the rule of exclusion for which they stand is not dependent upon such a showing. As the court said in Upshaw, 335 U.S. at page 413, 69 S.Ct. at page 172:

> "The Mitchell case [United States v. Mitchell, 322 U.S. 65] at p[age] 68 [64 S.Ct. at page 898] however, reaffirms the McNabb rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological * * *.'"

In the case of Porter v. United States, 103 U.S.App. D.C. 385, 258 F.2d 685, the opinion contains some observations indicating a less stringent construction of Rule 5(a) than seems to be warranted in view of Mallory. Analysis of that opinion, however, indicates that the court was not really called upon to define the scope of the words "unecessary delay."

The admissibility of two statements given by the accused was there in question. The court stated that the first statement was given almost immediately after arrest and without pressure of any kind except the mere fact of detention. This statement was therefore admissible under the principle announced in United States v. Mitchell without regard to whether there was subsequent unnecessary delay in arraignment. The court held that the second statement contained no incriminating statements. Hence, testimony concerning it could not have been prejudicial and it would be immaterial whether it was given during a period of unnecessary delay.

We hold that under the McNabb rule all testimony given by law enforcement officers concerning statements and admissions made by Ginoza after his arrest and prior to being taken before a committing magistrate was inadmissible.

The Government contends that this testimony was received without objection and that the motion to strike such testimony was untimely. A majority of this court are of the view that under the circumstances the motion to strike was timely and that the court erred in not granting such motion.

The judgment is reversed and the case is remanded for a new trial on Count III.

CHAMBERS, Circuit Judge, with whom BARNES and HAMLIN, Circuit Judges, concur (dissenting).

In the view of those who dissent here, the majority decision goes beyond what is required by McNabb, Upshaw and Mallory.* We deal not with a constitutional right but with a sanction built by the cases on Rule 5(a) of the Federal Rules of Criminal Procedure. Further, while opportunity for overreaching, rather than actual overreaching or abuse of the

---

* McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Mallory v. United States, 354 U.S. 449, 453, 77 S.Ct. 1356, 1 L.Ed.2d 1479. Actually, McNabb ante-dated Rule 5(a). For the interesting sequel to reversal of McNabb, see McNabb v. United States, 6 Cir., 142 F.2d 904, certiorari denied 323 U.S. 771, 65 S.Ct. 114, 89 L.Ed. 616.

prisoner, underlies Rule 5(a), still it is difficult to disassociate these latter elements from the results in the three cases. In Ginoza there was nothing cruel or crude.

And, when the burden was on Ginoza to prove "unnecessary delay," and when the trial court ruled in favor of the government, we believe that the time schedule of the majority tends to resolve questions of time in favor of the defendant.

In cases bottomed on facts, there will be some that fall clearly on one side of the stream and others that fall clearly on the other. At worst, it would appear that we have here a case in the middle where "unnecessary delay" ought to be left to the sound discretion of the trial judge.