Joseph C. **AMSLER** and **John W. Irwin,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 19509.**

United States Court of Appeals
Ninth Circuit.

May 3, 1967.

As Amended on Denials of Rehearing
July 3, 1967.

Ely, Circuit Judge, dissented in part.

Edgar Paul Boyko, Michael W. Rotberg, Los Angeles, Cal., for appellant, John Irwin.

Morris Lavine, Los Angeles, Cal., for appellant, Joseph C. Amsler.

Robert A. Neeb, Jr., Beverly Hills, Cal., Charles L. Crouch, Jr., Los Angeles, Cal., for appellant, Barry W. Keenan.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief Crim. Div., Donald R. Fareed, Asst. U. S. Atty., Chief Trial Atty., Los Angeles, Cal., for appellee.

Wm. Matthew Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief Crim. Div., Donald A. Fareed, Asst. U. S. Atty., Chief Trial Atty., Los Angeles, Cal., for appellee on rehearing.

Before BARNES, CECIL,* and ELY, Circuit Judges.

CECIL, Senior Circuit Judge.

The appellants, Joseph Clyde Amsler and John William Irwin, hereinafter referred to as defendants or as Amsler and Irwin, respectively, were indicted in the United States District Court for the Southern District of California,** Central Division, on a six-count indictment arising out of the alleged kidnapping and interstate transportation of Frank Sina-

---

* Lester L. Cecil, Senior Circuit Judge, Sixth Circuit, sitting by designation. (Sections 291(a), 294(b) (d), Title 28, U.S.C.)

** Now the Central District of California. Section 84, Title 28, U.S.C. as amended by P.L. 89–372, Mch. 18, 1966.

tra, Jr.[1] Amsler and Irwin were jointly indicted with one Barry Worthington Keenan.

The defendants were tried jointly to a jury. The jury returned verdicts of guilty against Keenan and Amsler on all six counts. A guilty verdict was returned against Irwin on counts one and three through six. Judgment was entered on the verdicts and all three defendants were sentenced to imprisonment. Separate appeals were perfected by each of the defendants but Keenan's appeal was subsequently dismissed on his motion. The District Court had jurisdiction to try the defendants on the indictments under Section 3231, Title 18, U.S.C. This Court has jurisdiction of the appeals under Sections 1291 and 1294(1), Title 28, U.S.C.

 The principal issues presented on these appeals relate to procedural questions. At the outset, counsel for Amsler challenges the jurisdiction of the trial court on the ground that the trial was not conducted where the alleged crime was committed as required by Article III, Section 2 of the Constitution[2] of the United States. It is not claimed that the trial was not held within the territorial limits of the state within which the crime was committed. The case was tried before a district judge of the United States District Court for the District of Oregon, on assignment by the Chief Judge of the Ninth Circuit, under Section 292(b), Title 28, U.S.C.[3] Oregon is in the Ninth Circuit, as is California, and there is no question of the regularity of the assignment under the statute. It is claimed that because the trial judge was from out of the state, the trial was not held within the limits of the state where the crime was committed. This claim is without merit. The personnel of a court is distinguishable from its territorial limits. It is further claimed that Section 292(b) is unconstitutional. No cases have been cited to us in support of this contention nor have we found any. We find nothing inconsistent between the provision that a district judge, resident and appointee of one district, may be assigned under statutory authority to a different district in the same circuit, and the constitutional requirement that a criminal case be tried within the territorial limits of the state where the crime was committed. See McDowell v. United States, 159 U.S. 596, 598, 16 S.Ct. 111, 40 L.Ed. 271; Lamar v. United States, 241 U.S. 103, 117–118, 36 S.Ct. 535, 60 L.Ed. 912; "Assignment of Judges to Other Districts," by Judge Yankwich, 3 F.R.D. 481, 486. Nor do we find anything in the rules of the Central Division of the Southern District of California[4] that would prevent the Chief Judge of the circuit from designating an out of state judge to try the case. Rules of court are not that arbitrary and inflexible. If there is a conflict between

---

1. At about 9 p. m. on December 8, 1963, Keenan and Amsler, both armed, entered the room of Sinatra, Jr., at Stateline, California (Lake Tahoe). At gunpoint they forced John Foss, who was in the room with Sinatra, to lie on the floor where they taped his hands and eyes. They took $20 from Sinatra's wallet at gunpoint, forced him to dress and took him from his room to Keenan's car. Sinatra was then forced to take two sleeping pills and lie down on the back seat with a black mask over his eyes. Sinatra was driven by his kidnappers through Nevada and finally to a house on Mason Avenue in Canoga Park, California, where he was held captive. Here they set up communication with Frank Sinatra, Sr., through Irwin. The ransom money was picked up about 12:45 a. m., on December 11th, and Sinatra, Jr. was released unharmed.

2. "The Trial of all Crimes, * * * shall be held in the State where the said Crimes shall have been committed; * * *."

3. "(b) The chief judge of a circuit may, in the public interest, designate and assign temporarily any district judge of the circuit to hold a district court in any district within the circuit."

4. Chapter II, Rule 3, Local Rules, United States District Court of California, Central Division: "New Rules Governing Assignment."

the rules and the statutes, the statutes must prevail. The district judge from Oregon, sitting by designation in the Southern District of California, had jurisdiction to try the case.

Counsel for Amsler challenges the indictment on the ground that it is duplicitous. It is claimed first that the kidnapping statute, Section 1201, Title 18, U.S.C., embraces all of the acts charged in all of the counts in the indictment and that therefore there is but one crime involved. Secondly, it is claimed that the conspiracy count of the indictment merged into the second and other substantive counts of the indictment and that the defendant Amsler cannot be guilty of conspiracy and a substantive offense arising out of the same transaction.

█ █ It is well established in federal criminal practice that a person may be convicted of conspiring to commit an offense against the United States and also of committing the substantive offense which is the subject of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, rehearing denied 329 U.S. 818, 67 S.Ct. 26, 91 L. Ed. 697; Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312, rehearing denied, 365 U.S. 825, 81 S.Ct. 687, 5 L. Ed.2d 703; Toliver v. United States, 9 Cir., 224 F.2d 742. The conspiracy count (Count 1) of the indictment is laid under Section 371, Title 18, U.S.C. It charges conspiracy to commit offenses under three sections of the criminal code, 1201 (a), 875(a) and 1202. Section 1201(c), which makes it an offense to conspire to violate Section 1201(a), did not repeal Section 371 by implication. Count 2 charges the substantive offense of kidnapping under Section 1201. Counts three, four and five charge three separate offenses of transmitting communi-

cations in interstate commerce demanding ransom money under Section 875(a). Count six charged all three defendants with receiving, possessing and disposing of ransom money in violation of Section 1202. Each count charges a separate offense and there is no merit to the claim that the indictment was duplicitous. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, is not in point. There the indictment charged one conspiracy whereas the Supreme Court found that there were eight conspiracies with one conspirator common to all of them.

█ Appellant Amsler claims that the trial court committed error in not granting his motion for a severance of his trial. The discretion of a court to grant or deny a severance under Rule 14 of the F.R.Cr.P.[5] will not be disturbed unless an abuse of such discretion is shown. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101. The mere fact that one co-defendant has made statements, incriminating other co-defendants, does not require that a severance be granted so long as the trial judge properly cautions the jurors that such statements are not to be considered against the other defendants. Opper v. United States, supra. Such caution was given in this case. It is not an abuse of discretion to deny severance even though the confession of one co-defendant, not binding upon, though incriminating, the other defendants, is received in evidence, if proper precautionary instructions are given. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; United States v. Howell, 3 Cir., 240 F.2d 149; Costello v. United States, 8 Cir., 255 F.2d 389, cert. den. 358 U.S. 830, 79 S.Ct. 52, 3 L.Ed.2d 69, rehearing den. 358 U.S. 901, 359 U.S. 1015, 79 S.Ct. 1146, 3 L.Ed.2d 901. No error was committed, therefore, in denying severance of Amsler's trial, in spite of the fact that

---

5. "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

confessions of the other defendants were received in evidence.

One of the assignments of error made on behalf of Amsler relates to the method of selecting the jury, referred to as the "Arizona System." The objection was directed primarily to the manner of exercising peremptory challenges. Rule 24(b) of the F.R.Cr.P. prescribes the number of challenges that shall be allowed to the government and to the defendant or the defendants but it does not prescribe how they shall be exercised.

The method to be used in selecting the jury was defined by the trial judge at the opening session of the trial. He said:

"Now, I will say to counsel that in my directions to the Clerk, I have indicated that he should draw initially 37 prospective jurors. That will tell you that that will provide for the ultimate 12. That will provide for six government challenges. That will provide 10 defendant challenges which the Court directs that they exercise jointly, and it will provide for one extra challenge for each defendant and for him to exercise in his own prerogative. It will provide for four alternates and one challenge by the Government and one challenge by the defendants to be exercised jointly as to the four alternates. So with that in mind, I will ask the Clerk to call 37 prospective jurors."

The trial judge conducted the voir dire examination, giving counsel ample opportunity to suggest further questions to be asked of the prospective jurors. If a prospective juror was excused for cause another one was called so that when the voir dire examination was completed there were 37 prospective jurors who had been passed for cause. Over the objection of counsel for all of the defendants, the trial judge directed the defense counsel to exercise peremptory challenges alternately with the government against the panel of 37 prospective jurors. The defendants were given ten challenges to be exercised jointly, and one each to be exercised individually. The government was given six peremptory challenges. The government and the defendants, jointly, each had one challenge to the four alternate jurors. When all of the challenges were exercised, the first 12 called to pass all challenges made up the jury. The next four were the alternates.

 Defense counsel argued that twelve jurors should have been seated in the jury box and challenges exercised alternately against the panel with replacements when any one was excused until twelve jurors were seated who had passed all challenges. The manner of qualifying a jury is largely discretionary with the trial judge. No specific method is prescribed. As the judge said: " * * * so at all times counsel knows who their ultimate jury is going to be, and it is not exercising a challenge and not knowing who you might draw subsequently." We think the "Arizona System" as used in selecting the jury was eminently fair to both sides and the trial judge did not err in this respect. A similar system of qualifying a jury was approved in Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208.

 Appellant, Amsler, further claims that the trial court erred in refusing to give the defendants the names and addresses of all of the prospective jurors and prospective witnesses at least three days before trial as required in all capital cases. (Section 3432 [6] Title 18, U.S.C.) Kidnapping is a capital offense only in those instances in which the victim is not released unharmed. The indictment herein did not allege that Frank Sinatra, Jr., was released unharmed and therefore, upon proof of harm, which could have been submitted under the indictment, the appellants could have received death sentences. The fact that no

6. "A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness."

such evidence was introduced at the trial does not eliminate the fact that the indictment would have supported such sentences. It is the possibility of an imposition of a death penalty under the indictment, not the evidence produced at the trial, which determines if the accused is entitled to the procedural benefits available in capital cases. Counsel for the government misconceive the effect of Section 1201 when they argue that the indictment did not state a capital offense because it did not allege that Sinatra was harmed at the time he was released.

"In other words, when the offense as charged is sufficiently broad to justify a capital verdict, the trial must proceed on that basis, even though the evidence later establishes that such a verdict cannot be sustained because the victim was released unharmed." Smith v. United States, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041. See also Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 1429.

The indictment therefore charged a capital offense and Section 3432, supra, was applicable. An indictment may charge a non-capital case of kidnapping under Section 1201 only if it is alleged in the indictment that the victim was released unharmed. United States v. Poitras, 4 Cir., 339 F.2d 428.

It was apparently conceded and understood by the court and counsel throughout the entire pre-trial proceedings that Sinatra was released unharmed. For this reason it appears that the offense was considered and tried as a non-capital offense. While we are unable to find in the record that there was any discussion of Section 3432 or that counsel for the defendants ever specifically requested the benefits under it, nevertheless the defendants were entitled to the application of its provisions as a matter of law.

Section 3432 is mandatory and defendants indicted for a capital offense must be given the benefit of its provisions. Logan v. United States, supra; McNabb v. United States, 123 F.2d 848 (C.A. 6), reversed on other grounds 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, rehearing den. 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727; Wilson v. United States, 104 F.2d 81 (C.A. 5), cert. den. 308 U.S. 574, 60 S.Ct. 89, 84 L.Ed. 481; Brown v. United States, 61 App. D.C. 359, 63 F.2d 136. It is the responsibility of the trial judge to interpret the indictment, determine what offense is charged and conduct the trial accordingly. The defendants should have been given a list of the veniremen and a list of the witnesses to be produced on the trial by the government, stating the place of abode of each venireman and witness three entire days before the trial. They should also have been allowed twenty peremptory challenges and such additional ones as the court in its discretion might allow. (Rule 24(b), F.R.Cr.P.)

Because of the failure to allow the defendants at least twenty peremptory challenges and the failure to give them lists of the veniremen and witnesses three days before the trial we must reverse. Although the defendant Irwin did not raise this question on appeal, the judgment of conviction against him will be reversed on the basis that the failure to allow him the benefits of Section 3432 and of Rule 24(b), F.R. Cr.P. was plain error. (Rule 52(b), F.R. Cr.P.)

We will discuss other assignments of error which may present questions in the retrial of this case.

Both Amsler and Irwin assign as error the admission of their confessions into evidence. We will first consider the confession of Irwin. On December 13, 1963, after spending the night at his brother's home in Imperial Beach, California, Irwin informed his brother of his connection with the Sinatra kidnapping, and that he was "sick of participating" and wanted to turn himself in. It was decided that the brother would call the F.B.I. Somewhere between 8:15 and 8:30 that morning, the brother telephoned the F.B.I., while Irwin listened on an extension. Irwin broke into the conversation and announced his participa-

tion in the kidnapping, the presence of some of the ransom money in his car and his desire to surrender himself.

At approximately 9 a. m. agents of the F.B.I. arrived at the brother's house and identified themselves. Irwin told them that his share of the ransom money was in his car and he gave Agent Mitchell the keys to his car. At Mitchell's request Irwin unlocked the car and an attache case was found containing United States currency. Prior to inspecting the car, the agent advised Irwin that he did not have to make a statement and that any statement he did make could be used against him in a court of law and that he had the right to consult an attorney if he desired. Irwin stated that he wanted to "make a clean breast of the situation." Irwin agreed to accompany the agents to F.B.I. headquarters, and during the fifteen to twenty minute ride there, reiterated his desire to "make a clean breast of this matter." While in the car Irwin explained to the agents his role in the kidnapping. This was a substantially complete statement of his participation in the crime from the time he arrived at the house in Canoga Park after the actual abduction of Sinatra. They arrived at headquarters at approximately 9:30 a. m., at which time Irwin permitted his person to be searched for concealed weapons or drugs. Immediately prior to being questioned, at approximately 10 a. m., Irwin was again advised of his right to remain silent, his right to an attorney and the fact that anything he said could be used against him. Throughout the period of the interview, there were numerous breaks for coffee, lunch, dinner and toilet relief. At 10 p. m. that night, a twenty-seven-page typed statement was completed and handed to Irwin to be read. Irwin said that he would prefer to read it in the morning. He was then taken to another room, where he was permitted to sleep. At 3 a. m. the next morning, appellant was taken before a United States Commissioner for arraignment, and was again advised of his rights. Bail was fixed in the amount of $50,000. He was then booked at the San Diego County Jail, where he was unable to sleep because there was no bed in the room to which he was taken. At 7:30 a. m. F.B.I. agents interviewed him at the jail. Irwin read the twenty-seven-page statement and made corrections on two pages. They were retyped, read, approved, and at 11 a. m., Irwin signed the statement.

Objection is made to the introduction of the confession on two grounds: one, that it was made during a period of unlawful detention in violation of Rule 5(a) of the F.R.Cr.P., and, two, that it was coerced and therefore not voluntary. Rule 5(a) requires that, following arrest, a person be brought before a United States Commissioner "without unnecessary delay." The McNabb-Mallory rule, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, rehearing den. 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727; 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, holds that any confession obtained during a time when the accused should have been brought before the Commissioner, is in violation of the rule, and inadmissible at any subsequent trial. Irwin claims that his confession, which he signed after appearing before the Commissioner, was a result of such an unlawful detention, or a "fruit of the poison tree," and hence inadmissible.

We cannot agree that the confession was taken during a period of unlawful detention. Irvin's whole relationship with the F.B.I. in this matter was completely voluntary. His first contact with the F.B.I. was by telephone through his brother at his request. He himself told the F.B.I. on the telephone that he was connected with the Sinatra kidnapping, that he had some of the ransom money and that he wanted to surrender to the F.B.I. His attitude was one of wanting to "make a clean breast of the matter" and a desire to "straighten out his relationship to the Sinatra case." At no time during the period of Irwin's questioning did he disaffirm this attitude or intention.

Irwin voluntarily "let the cat out of the bag" in his initial contact with the F.B.I. He voluntarily made virtually

a complete confession of his participation in the crime during the ride to F.B.I. headquarters. Anything short of this would have been inconsistent with his intention of surrendering himself and making "a clean breast of the matter." We cannot agree with counsel for Irwin that an illegal detention began with the ride to F.B.I. headquarters. In United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, rehearing den. 322 U.S. 770, 64 S.Ct. 1257, 88 L.Ed. 1595, the court held that spontaneous admissions of guilt by Mitchell immediately after arrest were admissible in evidence even though Mitchell was illegally detained for eight days thereafter. The admissions which Irwin made over the telephone, at his brother's house and during the ride to F.B.I. headquarters, were clearly admissible.

 We come now to the confession, under attack here, signed by Irwin a few hours after arraignment and admitted into evidence at the trial. The facts of this case are vastly different from the facts in Mallory v. United States, supra. In *Mallory,* a nineteen year old boy of limited intelligence was detained for hours and subjected to a lie detector test for the purpose of extracting a confession from him as a suspect in order to charge him with an offense. The purpose underlying the *McNabb-Mallory* rule is to prevent the police from employing such practices as the "third degree," and to prevent them from securing damaging statements from an accused by means of coercive pressures. The facts in this case indicate that the basic premise of the rule is inapplicable to Irwin's confession. Irwin made the first overtures to the F.B.I. and volunteered the information it was seeking. There was absolutely no pressure, coercive or otherwise, put upon the petitioner to surrender and admit his role in the kidnapping, except the pressure of his own conscience and his desire to "straighten out his relationship to the Sinatra case." It is not uncommon for a person to make a false confession to a highly publicized crime. It was necessary for the F.B.I. to verify and clarify the confession and admissions Irwin made prior to the time he was taken into custody. It seems inconceivable that Irwin would voluntarily give himself up and surrender to the F.B.I. and not contemplate giving a full account of his participation in the crime. Under all of the circumstances of this case, we conclude that Rule 5(a) of the F.R.Cr.P. was not applicable to Irwin.

 Furthermore, the confession was signed subsequent to the arraignment before the United States Commissioner and, therefore, cannot be said to have been made during a time when Irwin was unlawfully detained. Feguer v. United States, 8 Cir., 302 F.2d 214, 251, cert. den. 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110. See also, United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48. It is true that if the subsequent confession is the product of a prior unlawful detention, justice requires that it be excluded for the same reasons that any prior confession is excluded. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. However, it is obvious that the signed confession, under objection here, was a product of his voluntary statements which we have held here to be admissible in evidence. Once he let the "cat out of the bag" in his voluntary statements, he could not put it back in the bag, regardless of what transpired in his interrogation at F.B.I. headquarters.

We conclude that the confession was not inadmissible because of a violation of Rule 5(a) of the F.R.Cr.P. First, the rule was not applicable under the circumstances of this case and, second, because it was signed after arraignment and was not a product of a prior confession during illegal detention.

Ginoza v. United States, 9 Cir., 279 F.2d 616, and Morales v. United States, 9 Cir., 344 F.2d 846, are distinguishable on their facts from the case at bar. Both of these cases lack the element of spontaneity and voluntariness present in the case before us and in United States

v. Mitchell, supra. Ginoza was arrested with probable cause on suspicion of violating the Federal Narcotics Laws. He was held for interrogation until a confession upon which a charge could be predicated was extracted. The court held that his confession and incriminating statements made during his detention were inadmissible under the *Mallory* rule. Morales was arrested by state officers for violation of narcotics laws and held in state custody for fourteen hours before being turned over to federal narcotics agents. He was subjected to questioning by federal agents for three hours during which time damaging admissions were made. He was told that if he would "cooperate", his "cooperation" would be brought to the attention of the United States Attorney's office. A United States Commissioner was readily available in the same building where the questioning was conducted. The court held this to be in violation of the *Mallory* rule.

■■■ We find no merit to the contention that Irwin's confession was coerced and involuntary. The whole matter of his arrest was initiated by his desire to give himself up and "make a clean breast" of his role in the Sinatra kidnapping. He did just that and we cannot conceive how he can claim that the confession was coerced. There is no evidence that he was threatened in any way or that he was promised anything if he would tell his story or sign the ultimate written confession. It is argued that the F.B.I. agents said that they could testify orally to what he said even though he did not sign the written confession. This was true but we do not regard this as a threat. It is also said that he wanted to consult a lawyer before signing the confession. This is in conflict. The trial judge conducted a pre-trial hearing on the motion to suppress evidence. He found that the confession was voluntary and then submitted the issue to the jury. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, is not in point. There the defendant had been indicted and he had a lawyer. The objectionable evidence was obtained by the government through an informer by trickery. The doctrine of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, is not retroactively applicable to the case at bar. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

Amsler also contends that his signed statement should not have been admitted into evidence because it was obtained prior to his arraignment in violation of the *McNabb* rule and his constitutional rights. Several minutes after midnight on December 14, 1964, F.B.I. agents arrived at the apartment of Roger Dier in Los Angeles, where Amsler identified himself. An agent of the Bureau informed Amsler of his rights, advising him that he did not have to make a statement, that if he did, it could be used against him, and that he had a right to counsel. Another agent reiterated these rights to Amsler who stated that he realized this, but knowing that he had become involved in a serious thing, he wanted to clear it up. Approximately $168,500 in cash was found at the apartment, which Amsler stated was from the Sinatra kidnapping. Amsler was placed under arrest while at the apartment. During the drive from the apartment to F.B.I. headquarters, Amsler was again reminded of his rights. The conversation in the car pertained primarily to how Amsler and his associates were able to get through the road block and to the fact that Amsler had held a gun on Sinatra, Jr. They arrived at F.B.I. headquarters at approximately 1:30 a. m. One of the agents, some ten to fifteen minutes later, called the United States Commissioner at his home who stated that although he was not feeling well, he would be in his office in about an hour and a half. Prior to being finger-printed and photographed, Amsler requested and was provided with a package of cigarettes and a Coca-Cola. He was interviewed by two F.B.I. agents, from 2:22 a. m. until 3:27 a. m., who, prior to the actual questioning, advised Amsler that

he had been charged with violation of the Federal Kidnapping Statute, that he was not required to say anything, that anything he did say could be used against him, that anything he said must be voluntary, and that he had the right to consult an attorney. During this period, one of the agents wrote out a statement which Amsler read and which was read aloud to him. Then Amsler wrote, "I have read this statement consisting of two pages and it is true," and signed it. Amsler was then taken to the office of the United States Commissioner where he was arraigned at approximately 4 a. m. Amsler testified at the trial that he made the statement of his own free will, that he was advised of his rights, and that he was not subjected to any pressures, threats or promises.

On retrial we suggest, without deciding, the possible application of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, to the admissibility of the statements and confessions of the appellants. In Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, the Court held "that *Miranda* applies only to cases in which *the trial began after the date of our decision one week ago* (June 20, 1966)." (Emphasis added.)

 Under the circumstances, as indicated by the evidence, Amsler's statement was not received in evidence in violation of any of his rights under either the *McNabb* rule or the Federal Constitution. He was arraigned as promptly as the United States Commissioner could arrive at his office. He was repeatedly advised of his constitutional rights, and was not coerced in any manner. Therefore, the statement of appellant Amsler was properly received in evidence. The confessions of Irwin and Keenan were introduced into evidence under instructions to the jury that they were only to be considered against Irwin and Keenan, respectively. They were not to be considered as against Amsler and we find no error in this respect.

After obtaining the consent of Frank Sinatra, Sr. and Mrs. Nancy Sinatra,

agents of the Federal Bureau of Investigation listened on extension telephones and tape recorded several of the conversations between appellant Irwin and Sinatra, Sr. Irwin claims that the trial judge committed reversible error in permitting these tape recordings to be played to the jury.

 Section 605 of the Federal Communications Act (Section 605, Title 47, U.S.C.) provides:

"(N)o person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

Appellant Irwin claims that the admission of these tape recordings into evidence constituted a violation of this section because Irwin did not consent to the interception or publication of the conversation. In Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, rehearing den. 355 U.S. 925, 78 S.Ct. 363, 2 L.Ed.2d 355, the leading case on section 605, the court held that there was no unauthorized interception where a third party, with the consent of only one of the parties to the conversation, listened on an extension telephone and later testified as to the substance of the conversation.

"The clear inference [of Section 605] is that one entitled to receive the communication may use it for his own benefit or have another use it for him. * * * It has been conceded by those who believe the conduct here violates Section 605 that either party may record the conversation and publish it." 355 U.S., at p. 110, 78 S.Ct., at p. 163.

Although *Rathbun* did not involve a tape recording of the conversation, its rationale would support the ruling of the trial court in this case. There can be no "interception" within the meaning of section 605 because "(e)ach party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation." 355 U.S., at p.

111, 78 S.Ct. at p. 164. If a party to the conversation, or a third party with his consent, is permitted to testify as to the substance of the conversation, a recording should be similarly treated, it having the additional advantage of accuracy unblemished by emotions or the passage of time. Carnes v. United States, 5 Cir., 295 F.2d 598, cert. den. 369 U.S. 861, 82 S.Ct. 949, 8 L.Ed.2d 19.

This court, recognizing that tape recordings do not differ in principle from testimony as to the contents of conversations, has upheld their admission into evidence where one of the parties has consented to the recording. Carbo v. United States, 9 Cir., 314 F.2d 718, cert. den. 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed. 2d 498, rehearing den. 377 U.S. 1010, 84 S.Ct. 1902, 12 L.Ed.2d 1058; Lindsey v. United States, 9 Cir., 332 F.2d 688; Battaglia v. United States, 9 Cir., 349 F.2d 556, cert. den. 382 U.S. 955, 86 S.Ct. 430, 15 L.Ed.2d 360, rehearing den. 382 U.S. 1021, 86 S.Ct. 613, 15 L.Ed.2d 537. Therefore, the court did not err in admitting the tape recordings of the telephone conversations in question.

In another assignment of error it is claimed on behalf of Amsler that the court erred in denying a motion to suppress evidence relating to the United States currency which was recovered from the defendants, as the alleged ransom money delivered to them for the release of Sinatra, Jr. Specifically, it is claimed that the defendants were not permitted to "cross-examine" and "confront" the money.

There being no illegal search and seizure of the money, the trial judge properly denied the motion to suppress the evidence concerning it. The basis of this assignment of error seems to be that the defense counsel was not permitted to see, inspect, examine and count the actual currency that was recovered from the defendants. On the motion to suppress the actual currency involved was not before the court. Counsel for the government explained that it had been returned to the bank except for a few specimen bills retained from each source of recovery.

It was also explained that once money, which is identified by serial numbers, has been used in a criminal case, it is the practice to have such money removed from circulation through the Treasury Department and destroyed.

Although counsel for Irwin, at the hearing on the motion to suppress evidence, said, "We would require that it be produced," we find no motion under Rule 16(b) of the F.R.Cr.P. for an inspection of the money. The money had been turned over to the F.B.I. by the defendants and there was ample evidence identifying it, both in its preparation for delivery to the kidnappers and in its return. We find no prejudice to the defendants under this assignment of error and conclude that it is without merit.

The facts involved demonstrate that there is no merit to Amsler's contention that there was an illegal search and seizure of moneys when Irwin's car was searched in the absence of Amsler or counsel and without an arrest or search warrant. Irwin told the F.B.I. on the telephone that he had some of the ransom money in an automobile parked in front of his brother's house. Thirty minutes lated F.B.I. agents arrived, and Irwin handed Agent Mitchell the keys to the car and told him that the money was in it. Because Irwin freely and voluntarily directed the F.B.I.'s attention to the money, it cannot be said that there was an unreasonable search and seizure. United States v. Saka, 3 Cir., 339 F.2d 541. Irwin freely consented to the search and thereby waived any constitutional rights he might have had. Gilbert v. United States, 9 Cir., 307 F.2d 322, cert. den. 372 U.S. 969, 83 S.Ct. 1095, 10 L.Ed.2d 132.

It is claimed on behalf of Amsler that the federal court was without jurisdiction to try him for the reason that there was no evidence of interstate transportation of Sinatra, Jr. prior to his consent to the transportation and that the evidence showed both implied and express consent on the part of Sinatra, Jr. to the transaction. There is no merit

to this claim. The evidence was in conflict on the matter of consent and cooperation of Sinatra, Jr. There was ample evidence that he was restrained of his liberty under force and threat of force to submit the question of consent to interstate transportation to the jury. This evidence was likewise sufficient to support a denial of the motions for acquittal.

Another assignment of error is that the court erred in quashing a subpoena to Frank Sinatra, Sr. and in refusing to recall him for further examination. The defense claimed that it wished to examine him with reference to the money in question to determine whether it was actually paid as a ransom or whether it was paid as a publicity scheme. The record shows that the witness had been called by the prosecution and that he had been cross-examined by the defense in the areas in which they wished to re-examine him. After hearing counsel for Frank Sinatra, Sr. and counsel in the case, the court determined that to issue the subpoena would be an oppressive and unreasonable use of the process of the court. We conclude that there was no abuse of discretion on the part of the trial judge in quashing the subpoena and in not requiring Frank Sinatra, Sr. to appear for further examination. (Rule 17(b), (c), F.R.Cr.P.)

It is also claimed on the part of Amsler that the court erred in refusing a request to subpoena one John Hanson. A motion was made for the issuance of a subpoena and an affidavit of George A. Forde, one of the attorneys for Amsler, was filed in support of the claim of materiality. The trial judge held the motion in abeyance with the observation that the purpose of calling the witness was merely to fortify extra-judicial statements and self-serving declarations to be testified to by Amsler. Subsequently, when the trial judge sustained the government's objection to Amsler's testimony on the subject involved, he denied the request for the issuance of the subpoena. This was a matter within the discretion of the court and we find no error in this respect. Rule 17(b), (c),

F.R.Cr.P.; Goldsby v. United States, 160 U.S. 70, 16 S.Ct. 216, 40 L.Ed. 343; Feguer v. United States, supra.

It is claimed on behalf of Amsler that the court erred in limiting cross-examination of the government's witnesses. Each defendant was represented by his own counsel. During pretrial, the trial judge stated:

"Of course, each defendant will be honored with cross-examination of all of government's witnesses by his own attorney if he wishes, and the only restriction will be that there shall be no repetition of the same subjects."

This was a reasonable restriction and was a matter within the sound discretion of the court. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Kohatsu v. United States, 9 Cir., 351 F.2d 898, cert. den. 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017; Beck v. United States, 9 Cir., 298 F.2d 622, cert. den. 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed.2d 499. The record shows that the trial judge was liberal in allowing cross-examination by all defense counsel. There was no error in this respect.

Counsel for Amsler objects to the ruling of the trial judge on two questions asked on cross-examination of witness Ronald Bray. The court sustained an objection to the question, "Are you hoping that by this testimony that you are giving favorable to the prosecution, if it is, that you will not be prosecuted as a co-conspirator?" The question was reframed and the witness answered, "I hope I am not linked with this." The matter was not pursued further. The other question, "Isn't it a fact that he (Keenan) told you that you would not be prosecuted because Mr. Frank Sinatra, Jr. was co-operating?" had been previously asked in substantially the same form and answered by the witness in the negative. There was no error in the rulings on these questions.

During the direct-examination of F.B.I. Special Agent Emmet J. Murphy, counsel for the government asked the witness if anything further was said in

his interview with Keenan. The witness then related the substance of a conversation in which Keenan said that in thinking of who might have enough money to be a victim, the name of Tony Hope crossed his mind. No objection was made to this testimony at the time it was given. The following day counsel for Amsler, on behalf of all of the defendants, moved for a mistrial on two grounds: one, that the testimony was prejudicial, and, two, that the newspapers carried a story that Bob Hope's son was a near victim and that this would be prejudicial in the minds of the jurors.

On this appeal counsel for Amsler contends that the prosecutor was guilty of misconduct in presenting this evidence because it was foreign to the case at bar. It was made clear that this evidence was admitted only as to the defendant Keenan. The court instructed the jury that this was admissible for the purpose of showing intent. The evidence was a part of Keenan's story to the F.B.I. agent concerning the whole case. It was admissible as such and, in particular, it was admissible to show intent. It was not admitted against Amsler and no timely objection was made to it. There was no error on the part of the court in denying the motion for a mistrial.

There is no merit to the claim of counsel for Amsler that the trial judge invaded the province of the jury in defining the crime of kidnapping under count two of the indictment. We will discuss this more fully in connection with the requested instructions.

A court is not bound to accept the language of a requested instruction proffered by counsel nor to give a proposed requested instruction if the court gives it in substance. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed 624. Counsel for the defendants requested in writing instructions Nos. 1 through 12, to be given to the jury, on the issue of the consent of Frank Sinatra, Jr. to be kidnapped for publicity purposes. These instructions were denied by the trial judge and counsel for Amsler claims that this was prejudicial error. We find no merit to this claim.

The court fully and completely put the theory of the defendants' case before the jury, and properly instructed the jury on this important issue. The jury was instructed that if Sinatra, Jr. voluntarily accompanied the defendants or consented to be kidnapped, and that if the kidnapping was prearranged by Sinatra, Jr. or any other person, the defendants must be acquitted. The jury was told that consent may be expressly or impliedly given, and may be evidenced by action or inaction. The judge pointed out to the jury that Sinatra, Jr. testified that he consented to and cooperated with the defendants' requests during the kidnapping, but that it was for the jury to determine whether these expressions of consent were given of a free will or if he was subject to any physical or mental restraint. These instructions were not only correct, but reflected the sum and substance of the defendants' proposed instructions on the issue of consent.

The judge told the jurors that if they find that the defendants threatened Sinatra, Jr. with a pistol, they "may, if (they) wish, infer" that it was loaded with bullets and capable of causing bodily harm. The judge correctly stated that there was no evidence that any person ever made any arrangement with Sinatra, Jr. for his abduction. It was also correct to tell the jury that Amsler's and Irwin's testimony that Keenan told them that Sinatra, Jr. knew of the kidnapping beforehand, was not to be considered as to the truth of the statement, but only as it reflected on their intentions and beliefs. Such statements were clearly hearsay and the judge properly limited their import.

Amster requested an instruction (No. 3) to the effect that if Frank Sinatra, Sr. put up the $240,000 for publicity for his son, and not for ransom, the defendants must be acquitted. The judge did not commit error in denying this requested instruction. In the first place, if the purport of the instruction

was to the effect that Sinatra, Sr. arranged the kidnapping, such request was given when the judge instructed the jury that if the kidnapping was arranged by someone on Sinatra, Jr.'s behalf, the defendants must be acquitted. Furthermore, the motives of the defendants and Frank Sinatra, Jr., not his father, were in issue in this case.

■■■ The judge correctly refused Amsler's proposed instruction (No. 7) which stated, "In this case, the element of specific intent to commit a crime is essential before you can convict. If you find that the transactions were youthful pranks and not a crime, you must acquit the accused." The instruction is imprecisely drawn and is not an accurate statement of the law. The judge correctly charged the jury on the issue of intent.

■■■ Defendant's proposed instruction No. 13 relating to the illegality of the statement given by the defendants and introduced in evidence was properly refused. The issue of whether such statements were obtained in violation of the *McNabb-Mallory* rule presents a question of law for the court to determine. The judge properly instructed the jury on the issue of coercion and the voluntariness of the statements.

Requested instruction No. 21 to the effect that if money was put up for publicity purposes for Sinatra, Jr., and not for his release the jury must acquit was properly denied. A similar instruction was given by the court. The motives of those who put up the ransom money was not determinative, rather it was the motives of the defendants and Sinatra, Jr.

Therefore, the judge properly instructed the jury on the issues involved in this case, and did not commit error in denying any of the defendants' proposed instructions.

■■■ The assignments of error that Amsler was denied a public trial and that he was denied the right to tape record the trial proceedings are wholly without merit. The order [7] of the district judges of the Southern District of California, enforced by the trial judge, in restricting photography, broadcasting and television, was a proper precautionary measure to prevent a recurrence of the Estes (Estes v. State of Tex., 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543) and *Sheppard* (Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600) cases. The proceedings of the trial were reported by an official court reporter and apparently counsel were furnished with a daily transcript. There was no occasion for an unofficial tape recording.

Inasmuch as we must reverse on the basis of Smith v. United States, supra, we find it unnecessary to discuss other assignments of error since the questions raised thereby are not likely to occur at a second trial of the case.

The judgments of conviction of Amsler and Irwin are reversed and the case remanded to the District Court for retrial.

ELY, Circuit Judge (dissenting in part):

While I concur in the judgment of reversal, I cannot agree with the majority that there was here no violation of Rule 5(a), Federal Rules of Criminal Procedure.

Irwin was taken into custody by federal agents at 9 o'clock in the morning of December 13, 1963. Beginning one hour later, his interrogation continued uninterrupted, except for "numerous breaks for coffee, lunch, dinner, and toilet re-

---

7. "NOW, THEREFORE, IT IS HEREBY ORDERED that all forms, means and manner of taking photographs, or broadcasting or televising on or from the entire second floor or any part thereof, and Hearing Rooms No. 1 and No. 2 and corridors leading thereto on the Main Street Floor of the United States Post Office and Court House Building, located at 312 North Spring Street, Los Angeles, California, are hereby prohibited during the course of, or in connection with, any judicial proceedings, whether court is actually in session or not."

**54**

lief," for more than twelve hours. More than seven hours of this period were daylight hours of a weekday, a time when, I assume, a United States Commissioner would be readily accessible in the metropolitan city of San Diego. But it was not until 3 o'clock the next morning, after the interrogation had been completed and Irwin's statements had been reduced to writing, that the federal officers finally arranged for the arraignment required by Rule 5(a).

The majority opinion states that our decisions in Ginoza v. United States, 279 F.2d 616 (9th Cir. 1960), and Morales v. United States, 344 F.2d 846 (9th Cir. 1965), "are distinguishable on their facts from the case at bar." I disagree. In those cases, which held that federal officers would not be permitted to avoid the obligation imposed upon them by Rule 5(a), we undertook to establish requirements which were capable of being easily understood and applied. And, in the great bulk of cases which have arisen since *Ginoza* and *Morales* were handed down, federal officers have discharged that obligation in accordance with their requirements. The instant case involved the alleged abduction of the son of one of the world's best known entertainers, and perhaps it was because of the unusual public attention which focused on the matter that the particular agents were remiss in performing that obligation here.

The majority characterizes Irwin's declarations as "spontaneous" so as to apply the rule of United States v. Mitchell. Such a description connotes, to my mind, that those declarations were made impulsively, without deliberation and without external constraint or stimulus. I cannot accept the application of that label to statements which were obtained in an environment of interrogation which extended over a period of twelve hours.

I regret that my brothers have chosen to take a step which, in my view, must lead to new areas of controversy in the District Courts, as well as in our own.